[Cite as *State v. Essa*, 194, Ohio App.3d 208, 2011-Ohio-2513.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 94826**

## THE STATE OF OHIO,

APPELLEE,

v.

## ESSA,

APPELLANT.

**JUDGMENT:**
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-476832

**BEFORE:**   Celebrezze, P.J., Jones, J., and S. Gallagher, J.

**RELEASED AND JOURNALIZED:**   May 26, 2011

William D. Mason, Cuyahoga County Prosecuting Attorney, and
Matthew E. Meyer and Anna M. Faraglia, Assistant Prosecuting Attorneys, for appellee.

Stephen L. Miles, for appellant.

FRANK D. CELEBREZZE JR., Presiding Judge.

{¶ 1} Yazeed Essa, appellant, appeals his conviction for the aggravated murder of his wife, Rosemarie Essa. After a review of the record and pertinent law, we affirm appellant's conviction.

## Procedural History

{¶ 2} On February 7, 2006, appellant was indicted by the Cuyahoga County Grand Jury on one count of aggravated murder in violation of R.C. 2903.01(A), accusing him of purposely, and with prior calculation and design, causing the death of Rosemarie on February 24, 2005. On October 6, 2006, authorities in Lanarca, Cyprus, arrested appellant while he was traveling under a false Lebanese passport. Appellant fought extradition in Cyprus until December 12, 2008, when the Cypriot Minister of Justice issued an official surrender warrant. Appellant was transported to Cuyahoga County on January 9, 2009, and the trial court arraigned him on January 14, 2009, setting bond at $75,000,000.

{¶ 3} A jury trial commenced on January 19, 2010, and lasted until March 8, 2010, when the jury returned a verdict of guilty of aggravated murder, as charged in the indictment. On March 10, 2010, the trial court conducted a sentencing hearing, during which appellant was sentenced to life in prison with parole eligibility after 20 years.

**Statement of Facts**

{¶ 4} On February 24, 2005, Rosemarie called her long-time friend, Eva McGregor, at 1:53 p.m. while McGregor was at work and Rosemarie was driving to meet her sister at a movie. McGregor testified that Rosemarie told her that she was running late and was feeling nauseous:

{¶ 5} "She said that she had taken a calcium pill right before she left her house. And I said, calcium. I said, When did you start taking calcium?

{¶ 6} "And she said, well, she was at [appellant]'s family, and they had a discussion that because of her age she should start to take calcium, and she said she really didn't want to take it, and she said that she was rushing out the door. He said, here, take it. Take your calcium.

{¶ 7} "And then she said I just — that I took it, and she said now, I don't know if that's what's making me sick. * * * She said to me that she was going to call [appellant] and ask him if the calcium pill he gave her could be making her sick. Could be making her feel so nauseous."

{¶ 8} Shortly after Rosemarie's conversation with McGregor, Rosemarie was involved in an automobile accident. At trial, Tera Tanski testified that she witnessed Rosemarie's black Volvo veer off the road and hit another car, slow down, and veer back. Rosemarie's car was going so slowly that Tanski got out of her own car, chased the Volvo on foot, opened Rosemarie's door, and brought the car to a stop. Rosemarie's eyes were open but glassy, and she did not speak. Tanski testified that she held Rosemarie's jaw while Rosemarie vomited on her leg and on the pavement.

{¶ 9} Thereafter, Rosemarie was rushed to Hillcrest Hospital and was pronounced dead within a half hour of her arrival at the hospital. Eric White, D.O., testified that on February 24, 2005, he treated Rosemarie at the emergency room of Hillcrest Hospital. Dr. White testified that Rosemarie had arrived by ambulance and had reportedly been in a minor motor-vehicle accident. When Rosemarie arrived at the hospital, she had shallow breathing and erratic heartbeat, and was unresponsive; however, she had no major signs of trauma. After 30 to 40 minutes of attempting to revive Rosemarie, Dr. White saw no signs of improvement. After a discussion, appellant told Dr. White to "just call it," and Dr. White agreed to stop trying to revive Rosemarie. Dr. White stated that at the time of Rosemarie's death, there was nothing about her symptoms that indicated cyanide poisoning; however, the cause of her death was a mystery to Dr. White based on the low impact of the motor-vehicle accident and the lack of major signs of trauma.

{¶ 10} Rosemarie's brother, Dominic DiPuccio, learned of Rosemarie's car accident when appellant called to find out if he could drop his children off at Dominic's home on the way to the hospital. Julie DiPuccio, appellant's sister-in-law, stated that appellant was in such a hurry that his daughter was not fully dressed. When the DiPuccios arrived at the hospital, they learned that Rosemarie was not going to make it. As more people arrived at the hospital, the family decided to have everyone gather at Rosemarie's house. At that time, Dominic received a call from McGregor. Upon learning that Rosemarie had died, McGregor told Dominic about the conversation she had had with Rosemarie just moments before her death and Rosemarie's belief that the

calcium pills caused her nausea. This information caused Dominic to demand that a full autopsy and toxicology testing be done by the county coroner the following day.

{¶ 11} Forensic pathologist, Elizabeth Balraj, M.D., was the elected county coroner at the time David Dolinak, M.D., performed Rosemarie's autopsy on February 25, 2005. At the time of the autopsy, there was no indication of any injuries, and an internal examination showed no evidence of trauma. As a result, Dr. Balraj was unable to determine Rosemarie's cause of death at the time of her autopsy and referred the matter for toxicology screening. The normal toxicology screens did not reveal any unusual substances in Rosemarie's system.[1]

{¶ 12} On March 17, 2005, appellant voluntarily met with Detective Gary McKee of the Highland Heights Police Department and gave him a statement concerning his wife's death. McKee testified that at the time he interviewed appellant, he did not suspect that appellant had anything to do with Rosemarie's death. In the course of the interview, appellant informed McKee that Rosemarie had been taking prenatal vitamins and calcium supplements. Later that evening, McKee followed appellant to his home and retrieved Rosemarie's prenatal vitamins and calcium supplements. McKee testified that prior to appellant's handing the pills over to him, appellant asked why he was collecting the pills, and McKee responded, "Well, you know my boss told me I should collect these so we can do a complete — we cover all the bases."

---

[1] The initial toxicology screen tested Rosemarie's blood for signs of alcohol or drug abuse. Additionally, the screening looks for signs of prescription drugs taken by the individual tested. The initial screens will not indicate signs of specific poisons, such as cyanide.

{¶ 13} Firas Essa, appellant's brother, testified that after appellant's March 17, 2005 interview with the Highland Heights Police Department, he helped appellant flee the United States. Firas testified that appellant wanted to get out of town because he was concerned that people would find out about his extramarital affairs with Marguerite Montanez and Michelle Stephens. Firas enlisted the help of his cousin, Sam Qasem, who had experience smuggling fugitives out of the country. They concocted a ruse to go to Detroit with appellant to gamble, where appellant would cross the border into Canada. To explain his absence, appellant supplied a phony story that a friend had been injured in North Carolina.

{¶ 14} Appellant's cousin, Abraham Awad, accompanied the group to Detroit for what he thought would be a gambling trip. Awad rode in a car with Sam Qasem, Firas, and appellant. During the car ride, appellant explained that he was running from the authorities and why he was running:

{¶ 15} "Q. And did [appellant] at that time, in the car ride, indicate to you why the police asking him about [Rosemarie]'s death would cause him or trigger him to want to leave the country?

{¶ 16} "A. He stated he was scared, that he was nervous.

{¶ 17} "Q. Afraid of what?

{¶ 18} "A. Afraid of being implicated in the death, blamed for [Rosemarie]'s death.

{¶ 19} "Q. And how would he be blamed for [Rosemarie]'s death?

{¶ 20} "A. I guess they found some pills in the house.

{¶ 21} "Q.   What about those pills in the house?

{¶ 22} "A.   They were laced with calcium or something.

{¶ 23} "Q.   Calcium laced?

{¶ 24} "A.   I'm sorry, not calcium laced.   Cyanide — calcium pills that were cyanide laced."

{¶ 25} Once in Canada, Awad arranged for appellant to fly to Lebanon, where he would be taken care of.   When appellant arrived in Lebanon, he assumed the name George Khalife.

{¶ 26} On March 21, 2005, Dominic filed a missing-persons report for appellant. On April 7, 2005, Dominic received a phone call from appellant.   During that conversation, appellant told Dominic, "I'm in a really bad place, close to Iran.   I talked to my lawyer, and he told me that they got enough to put me in jail, it could be years before it's a trial, and I don't want to put my family through that, I don't want to put you guys through that."   Dominic told appellant, "If you didn't do anything, you don't have anything to worry about.   Your children need you."   In response, appellant stated, "You know, I can't do that."

{¶ 27} Douglas Rohde testified that he was employed by the Lake County Crime Lab and that on March 22, 2005, he inspected the calcium capsules that were retrieved by McKee.   In the course of his inspection, Rohde determined that nine of the 56 capsules tested contained cyanide.

{¶ 28} Raymond Jorg testified that he is employed as a fingerprint examiner for the Lake County Forensic Lab and that on April 8, 2005, he examined eight capsules that

contained cyanide for fingerprints. He was able to detect that three of the eight pills had some fingerprint ridges, but was unable to make a comparison to a known print.

{¶ 29} As a result of the police investigation that revealed cyanide in Rosemarie's pills, forensic pathologist, Dr. Dolinak, became concerned that cyanide was a factor in Rosemarie's death. On April 21, 2005, a more elaborate screening for signs of poison was conducted, and the test revealed 9.1 milligrams of cyanide per liter of Rosemarie's blood. Additionally, coroner investigators discovered cyanide in bits of vomit taken from Rosemarie's car. On April 22, 2005, the Cuyahoga County Coroner's Office made a determination that Rosemarie had died as a result of acute cyanide intoxication.

{¶ 30} Michelle, a nurse at Akron General Medical Center, testified that she had carried on an intimate relationship with appellant beginning in October 2004. Michelle testified that appellant had been unhappy in his marriage and had planned to leave his wife. On a regular basis, appellant told Michelle that he loved her. Just days before Rosemarie's death, appellant sent Michelle a handwritten Valentine's Day card that read, "Happy Valentine's Day. I can't wait to see you in this. I have my own selfish reasons for giving you this gift. Next Valentine's Day will be all ours. I love you with all my being." When Rosemarie died, appellant made a hysterical call to Michelle and asked her to come to his house to be with him on February 24, 2005. Appellant told Michelle, "You will be the only mommy that [his children] will remember, and I bet you never expected this."

{¶ 31} Marguerite testified that she was employed by appellant's company, Dish One Up, and had an on-and-off relationship with appellant. Marguerite stated that on

March 17, 2005, appellant called her while she was babysitting his children at his house and told her that the police were coming to get Rosemarie's medications. Thereafter, appellant arrived at the home with Detective McKee and provided him with various pill bottles, including the calcium pills. Marguerite testified that after McKee left the house, appellant "flipped out" and was cussing and angry.

{¶ 32} Jamal Khalife testified that he has lived in Beirut, Lebanon for the past 15 years. In June 2005, Khalife was asked by his brother to pick up appellant from the airport in Beirut and take care of him. Khalife provided appellant with "five or six" fake IDs and a place to stay in Beirut. While appellant was in Beirut, Khalife learned that appellant was wanted by the authorities in the United States. Khalife testified that appellant told him that he was responsible for the death of Rosemarie. Khalife stated, "He told me the whole story, from the beginning. * * * that his wife was in the home, going, I think, to a movie, and he provided two vitamin pills, and down the street she had a car accident, and she died. * * * and he ground the cyanide, refilled the pills." When asked whether appellant gave him an indication as to why he killed his wife, Khalife stated, "At the beginning I think he said something about she's cheating on him, or something like that." Khalife stated that appellant openly bragged with numerous people in Lebanon about killing his wife, and he warned appellant to keep his mouth shut, but appellant would not listen.

{¶ 33} On cross-examination, Khalife acknowledged that he had been indicted on a 29-count federal indictment in October 1994, and he received a plea to lesser charges and hoped for the possibility of a reduced sentence in exchange for his truthful testimony in

appellant's case. Additionally, Khalife received immunity in connection with any of his testimony in this case and his role in harboring appellant.

{¶ 34} Firas testified that on February 24, 2005, he was in Mexico when he received a call from his frantic brother concerning the death of Rosemarie. Firas acknowledged that he had pleaded guilty to obstruction of justice and tampering with evidence in connection with his assistance in helping appellant flee the country.

{¶ 35} Firas stated that appellant had had many girlfriends, including Marguerite and Michelle, and that he did not believe Rosemarie had any knowledge of appellant's affairs. Firas acknowledged that he knew appellant had purchased the calcium pills for Rosemarie. However, he testified that appellant denied having any involvement in Rosemarie's death.

{¶ 36} On cross-examination, Firas testified that appellant was a compulsive womanizer, both before and after his relationship with Rosemarie. Firas testified that prior to their marriage, Rosemarie and appellant separated after Rosemarie learned that appellant was seeing another woman, but appellant won her back by vowing to stay faithful. Firas testified that after the couple married, appellant continued to cheat, but kept his affairs secret from Rosemarie. According to Firas, appellant was happy in his marriage and was a great father to his children.

{¶ 37} On redirect, Firas was asked to explain a January 13, 2009 telephone recording between himself and appellant, who was in jail, in which appellant asked Firas about paying an individual "$35,000 to shut up," and finding a couple of new witnesses for the prosecutors "to make their heads spin." Firas explained that he made up

witnesses as a ruse to throw prosecutors "for a loop" and that the $35,000 had to do with a ten-year-old dispute with a girlfriend. Firas maintained that the $35,000 was not used to shut up anyone. When asked by the prosecutor if he had engaged in yet another obstruction-of-justice scheme, the trial court advised Firas of his Fifth Amendment rights. Thereafter, Firas invoked his Fifth Amendment rights and asked to consult with his attorney.

{¶ 38} Thirteen days later, Firas returned to complete his testimony. Prior to taking the stand, trial counsel discussed the matter in chambers, where the state disclosed that it did not intend to bring further charges against Firas, Omar, or Abe Awad, if Firas testified truthfully concerning the conversations with his brother. Firas then testified:

{¶ 39} "Q. [D]id you ever have an opportunity to talk with your brother about Rosie's death?

{¶ 40} "A. Yes.

{¶ 41} "Q. What did he say to you?

{¶ 42} "A. The second trip is what you're asking me about, and that's when he admitted that he was responsible for [Rosemarie]'s death.

{¶ 43} "Q. What do you mean by admitted that he was responsible for [Rosemarie]'s death?

{¶ 44} "A. I asked him if he was responsible for her death, and he said yes.

{¶ 45} "Q. What did he tell you that he did?

{¶ 46} "A. He said he put cyanide in the capsules. * * *

{¶ 47} "Q. Why are you here today?

**{¶ 48}** "A.   To testify truthfully.

**{¶ 49}** "Q.   And why is it important that you come here and testify truthfully today?

**{¶ 50}** "A.   Because if I don't, I'll be in violation of my plea agreement, and I could face substantial prison time."

**{¶ 51}** Appellant now appeals his conviction for aggravated murder, raising 11 assignments of error for our review.[2]

## Law and Analysis

### Jury Instructions

### I

**{¶ 52}** In his first assignment of error, appellant argues that he was denied his rights to equal protection and due process when the trial court failed to give a cautionary jury instruction regarding the testimony of Khalife and Firas.  Specifically, appellant contends that the trial court erred when it refused to grant his request that the court amend the standard witness-credibility instruction to include language requiring the jury to take into consideration the substantial plea agreements offered to Khalife and Firas in exchange for their testimony against appellant.

**{¶ 53}** "When reviewing a trial court's jury instructions, the proper standard of review for an appellate court is whether the trial court's refusal to give a requested instruction or giving an instruction constituted an abuse of discretion under the facts and

---

[2] Appellant's assignments of errors are contained in the appendix to this opinion.

circumstances of the case. See *State v. Wolons* (1989), 44 Ohio St.3d 64, 68, 541 N.E.2d 443. In addition, jury instructions are reviewed in their entirety to determine if they contain prejudicial error. *State v. Porter* (1968), 14 Ohio St.2d 10, 235 N.E.2d 520." *State v. Williams*, Cuyahoga App. No. 90845, 2009-Ohio-2026, ¶ 50. To constitute an abuse of discretion, the ruling must be unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 450 N.E.2d 1140.

{¶ 54} In support of his position, appellant argues that the trial court should have instructed the jury similarly, if not identically, to the accomplice jury instruction in R.C. 2923.03(D). When an accomplice testifies on behalf of the state in exchange for a plea agreement, there is a possibility that the accomplice's testimony may be self-serving and biased. *State v. Small*, Cuyahoga App. No. 84768, 2005-Ohio-1316, ¶16, citing *State v. Muntaser*, Cuyahoga App. No. 81915, 2003-Ohio-5809. Therefore, R.C. 2923.03(D) requires that the court give the jury a special instruction on the credibility of accomplices, as follows:

{¶ 55} "If an alleged accomplice of the defendant testifies against the defendant in a case in which the defendant is charged with complicity in the commission of or an attempt to commit an offense, an attempt to commit an offense, or an offense, the court, when it charges the jury, shall state substantially the following:

{¶ 56} " 'The testimony of an accomplice does not become inadmissible because of his complicity, moral turpitude, or self-interest, but the admitted or claimed complicity of a witness may affect his credibility and make his testimony subject to grave suspicion, and require that it be weighed with great caution.

{¶ 57} " 'It is for you, as jurors, in the light of all the facts presented to you from the witness stand, to evaluate such testimony and to determine its quality and worth or its lack of quality and worth.' "

{¶ 58} Alternatively, appellant argues that the trial court should have instructed the jury similarly, if not identically, to Federal Sixth Circuit Jury Instruction 7.07, which states:

{¶ 59} "7.07  Testimony of a witness under grant of immunity or reduced criminal liability.

{¶ 60} "(1) You have heard the testimony of _____.  You have also heard that the government has promised him _____ in exchange for his cooperation.

{¶ 61} "(2) It is permissible for the government to make such a promise.  But you should consider _____'s testimony with more caution than the testimony of other witnesses.  Consider whether his testimony may have been influenced by the government's promise.

{¶ 62} "(3) Do not convict the defendant based on the unsupported testimony of such witness, standing alone, unless you believe his testimony beyond a reasonable doubt."

{¶ 63} Despite appellant's contentions, R.C. 2923.03(D) and Federal Circuit Jury Instruction 7.07 are inapplicable to the case at hand.  In *State v. Sawyer* (Mar. 14, 2002), Cuyahoga App. No. 79197, 2002 WL 407935. this court held that where evidence presented at trial does not demonstrate that the witness acted as an accomplice, "the defendant's claim that the court should have given an instruction in line with R.C.

2923.03(D) is unfounded." See also *State v. Summers* (Oct. 23, 1995), Stark App. No. 94-CA-0243 (the instruction required by R.C. 2923.03(D) was not appropriate where the witness was not an accomplice or coconspirator); *State v. Carroll*, Clermont App. Nos. CA2007-02-030 and CA2007-03-041, 2007-Ohio-7075, ¶ 138-149 (the trial court was not required to give 2923.03(D) instruction in murder prosecution where witness was given immunity from prosecution and where witness was neither indicted nor a codefendant and did not admit taking part in any crime for which appellant has been indicted); *State v. Wellman*, Franklin App. No. 05AP-386, 2006-Ohio-3808, ¶ 58 ("The trial court properly determined that the accomplice instruction was inappropriate given that there was no evidence in the record that [the witness] and appellant were accomplices").

{¶ 64} As in the foregoing cases, neither Firas nor Khalife qualified as an accomplice to the aggravated murder of Rosemarie. Appellant has provided no case law to support his position that a jury instruction similar to R.C. 2923.03(D) should be given when the witness is not an accomplice but has received a plea agreement in consideration for his testimony against the defendant. Similarly, this court is not bound to apply federal jury-instruction provisions, and appellant has failed to provide any case law in support of his position. Therefore, the trial court had no basis to apply R.C. 2923.03(D) or Federal Circuit Jury Instruction 7.07. The trial court did not abuse its discretion in giving the jury the standard instruction regarding witness credibility.

{¶ 65} Appellant's first assignment of error is overruled.

**Prosecutorial Misconduct**

{¶ 66} In his second and third assignments of error, appellant raises claims of prosecutorial misconduct.

## II

{¶ 67} In his second assignment of error, appellant argues that he was denied a fair trial when the state prosecutor engaged in misconduct during closing argument. Specifically, appellant contends that the prosecutor inappropriately referred to the testimony of attorney Larry Zukerman, which was previously excluded by the trial court pursuant to appellant's pretrial motion in limine. Appellant submits that the prosecutor's unsupported and misleading closing argument violated his constitutional right to a fair trial under both the Ohio and United States Constitutions. We disagree.

{¶ 68} During closing arguments, over objection, the prosecutor stated the following to the jury:

{¶ 69} "Now, he wants to tell you, or they want to tell you, well, his brother counseled him to run, or that his lawyer, he got bad legal advice. Larry Zukerman told him, you got to get out of town because you're going to get charged with capital murder. Well, the only way that Larry Zukerman would tell him about that is that the Defendant admitted to him that these pills were laced with cyanide. There's no lawyer who is going to put their ticket on the line to tell him to run unless he had significant information about the Defendant admitting —

{¶ 70} "Defense Counsel: Objection, your Honor.

{¶ 71} "Prosecutor: — that he was responsible —

{¶ 72} "Court: Overruled.

{¶ 73} "Prosecutor:  — for his wife's death."

{¶ 74} Courts afford prosecutors wide latitude in making closing arguments. *State v. Benge* (1996), 75 Ohio St.3d 136, 141, 661 N.E.2d 1019. The touchstone of this analysis is the fairness of the trial, not the culpability of the prosecutor. *State v. Noling*, 98 Ohio St.3d 44, 2002-Ohio-7044, 781 N.E.2d 88, ¶ 91. The test regarding prosecutorial misconduct in closing arguments is whether the remarks were improper, and if so, whether they prejudicially affected substantial rights of the defendant. *State v. Smith* (1984), 14 Ohio St.3d 13, 14, 470 N.E.2d 883. Further, " '[i]t is well settled that a party cannot complain of [an] opponent's argument to the jury, where it amounts only to a reply in kind to matters argued' by the complaining party." *State v. Hopkins*, Franklin App. No. 05AP-338, 2006-Ohio-232, ¶ 31, quoting *State v. Roland* (Mar. 15, 1979), Cuyahoga App. No. 38393.

{¶ 75} Here, the prosecutor made the above statements in response to the defense attorney's closing argument. Specifically, the defense attorney attempted to minimize appellant's flight from the country by arguing that he fled only because "[h]e [was] vulnerable to bad advice that he got from his brother, Firas, and his lawyer, Larry Zukerman."

{¶ 76} Appellant misreads the context of the prosecutor's comments, which were designed to dismantle the argument that Zukerman influenced appellant to flee the country. The prosecutor did not vouch for the credibility of Firas or Khalife, violate attorney-client privilege, or intentionally misstate facts. Rather, the prosecutor merely

replied to appellant's defense counsel's argument concerning Zukerman's alleged "bad advice."

{¶ 77} Dominic DiPuccio testified that when appellant contacted him on March 17, 2005, appellant told him that he had fled the country, in part, because his attorney believed that there was enough evidence against him to support an indictment. However, there was no testimony that Zukerman advised appellant to leave the country. The comments made by the prosecutor were meant to rebut any argument that appellant relied on Zukerman's advice to flee the country.

{¶ 78} Assuming arguendo that the sarcasm in a portion of the prosecutor's comments was improper, appellant has failed to establish any prejudice. The statements did not rise to the level of prosecutorial misconduct. Therefore, we overrule appellant's second assignment of error.

### III

{¶ 79} In his third assignment of error, appellant argues that the state committed prosecutorial misconduct when it elicited testimony from Firas's attorney, Robert Glickman, concerning the truthfulness of Firas. On cross-examination, the prosecutor questioned Glickman concerning his representation of Firas. Appellant submits that the prosecutor, in his cross-examination of Glickman, caused Glickman to vouch for the veracity of Firas. We disagree.

{¶ 80} The following dialogue took place:

{¶ 81} "Prosecutor: Okay. And you're Firas Essa's attorney, is that correct?

{¶ 82} "Glickman: Yes.

{¶ 83} "Prosecutor: Mr. Essa came in here and testified to the ladies and gentleman of the jury and told the ladies and gentleman of the jury that his brother admitted to poisoning his wife. Were you here for that testimony?

{¶ 84} "Glickman: I was.

{¶ 85} "Prosecutor: Okay. And as far as when [Firas] came in here to testify, did you advise him that he needs to give complete and truthful testimony?

{¶ 86} "Glickman: I don't have a waiver from my client to tell you what I advised him. I will tell you I've never advised my client not to give anything but complete and truthful testimony.

{¶ 87} "* * *

{¶ 88} "Prosecution: At any time would you give advice to your client to come in and give false testimony to a jury?

{¶ 89} "Glickman: Of course not."

{¶ 90} Generally, the opinion of a witness as to whether another witness is being truthful is inadmissible. *State v. Boston* (1989), 46 Ohio St.3d 108, 128, 545 N.E.2d 1220. In our system of justice, it is the fact-finder, not the expert or lay witness, who bears the burden of assessing the credibility or veracity of a witness. *State v. Eastham* (1988), 39 Ohio St.3d 307, 312, 530 N.E.2d 409.

{¶ 91} Our review of the record indicates that Glickman never testified as to whether he believed that Firas testified truthfully. Rather, he indicated only that he would never direct any client to tell anything other than the truth. Accordingly, we find

that Glickman did not give any opinion regarding Firas's veracity. Appellant's third assignment of error is overruled.

**Evidentiary Challenges**

{¶ 92} In assignments of error four, five, six, and seven, appellant raises numerous evidentiary challenges. These assignments of error will be considered out of order for the purposes of clarity.

{¶ 93} "The admission or exclusion of evidence rests within the sound discretion of the trial court." *State v. Jacks* (1989), 63 Ohio App.3d 200, 207, 578 N.E.2d 512. Therefore, "[a]n appellate court which reviews the trial court's admission or exclusion of evidence must limit its review to whether the lower court abused its discretion." *State v. Finnerty* (1989), 45 Ohio St.3d 104, 107, 543 N.E.2d 1233. A trial court abuses its discretion when it acts in an unreasonable, arbitrary, or unconscionable manner. A reviewing court should not substitute its judgment for that of the trial court. See generally *State v. Jenkins* (1984), 15 Ohio St.3d 164, 473 N.E.2d 264.

**IV**

{¶ 94} In his fifth assignment of error, appellant argues that the trial court abused its discretion by allowing evidence of his venereal disease. We disagree.

{¶ 95} Prior to trial, the court granted appellant's motion in limine to exclude evidence relating to his venereal disease, with the explicit proviso that "[i]n the event that defendant's character, as it relates to this issue, is presented by defendant, the court reserves the right to revise this ruling at trial."

{¶ 96} On cross-examination of Firas, defense counsel elicited testimony that appellant had had many sexual relationships with women before and after his marriage and that he had been discreet about these affairs to keep them from his wife. Subsequently, the trial court ruled, over defense counsel's objections, that the fact that appellant had a venereal disease and the fact that he recklessly gave the disease to other women, including his wife, was relevant to rebut the argument that appellant was discreet about his affairs.

{¶ 97} When a defendant opens the door to otherwise inadmissible evidence, the state may use relevant information to rebut the inference arising from that evidence. *State v. Jackson* (1991), 57 Ohio St.3d 29, 565 N.E.2d 549. The Ohio Supreme Court has described rebuttal evidence as follows: Rebuttal evidence, the scope of which lies within the discretion of the trial court, is that which is "given to explain, refute, or disprove new facts introduced into evidence by the adverse party." *State v. McNeill* (1998), 83 Ohio St.3d 438, 446, 700 N.E.2d 596.

{¶ 98} Throughout the trial, defense counsel presented testimony to the jury that Rosemarie had no knowledge of appellant's affairs, that appellant was happy in his marriage, and that he was a loving father. Therefore, we agree with the trial court's assertion that the testimony relating to appellant's reckless sexual behavior was relevant to rebut defense counsel's position that appellant had been a discreet philanderer, keeping his affairs secret from his wife. As observed by the trial court, appellant's sexual behavior did not appear to be discreet, and Firas's testimony that appellant had spread his venereal disease was relevant to rebut defense counsel's position that Rosemarie was

unaware of appellant's affairs.   Faced with appellant's introduction of his own character through the testimony of his brother Firas, the trial court acted within its discretion by allowing evidence of appellant's reckless sexual behavior to be presented to the jury.

{¶ 99} Accordingly, appellant's fifth assignment of error is overruled.

## V

{¶ 100} In his fourth assignment of error, appellant argues that the trial court should have granted a mistrial due to what he contends was improper character and opinion evidence.   Specifically, appellant challenges portions of testimony offered by four of the state's witnesses.   Appellant submits that his due process rights to a fair trial were denied when McGregor, Michelle, Marguerite, and Gina Hasrouni offered irrelevant and prejudicial testimony.   We disagree.

{¶ 101} The trial court is in the best position to determine whether a mistrial should be declared.   *State v. Ahmed*, 103 Ohio St.3d 27, 2004-Ohio-4190, 813 N.E.2d 637, ¶ 92.  Thus, the decision whether to grant a mistrial is within the discretion of the trial court, and we will not disturb that decision on appeal absent an abuse of discretion.   Id.

### Eva McGregor

{¶ 102} Initially, appellant complains of several statements made by McGregor during her direct examination.   On direct examination, McGregor testified that Rosemarie told her that appellant gave her a venereal disease prior to their marriage. Appellant contends that this testimony is irrelevant and highly prejudicial.   We disagree. The record reflects that Rosemarie broke up with appellant prior to their marriage based, in part, on appellant's having given her a venereal disease and her discovery that

appellant was having an affair. This evidence was relevant and assisted the jury in understanding the relationship of appellant and Rosemarie.

{¶ 103} McGregor further testified that she and Rosemarie had lunch in January 2005 and that Rosemarie had told her a "disturbing story." Appellant contends that McGregor's discussion of the disturbing story clearly alluded to evidence concerning some anti-freeze left in Rosemarie's car that was the subject of a motion in limine and barred by the trial court from being testified about at trial. Counsel for appellant immediately objected, and the trial court sustained the objection and prevented McGregor from finishing her testimony concerning the "disturbing story." The remark was isolated, and the jury did not hear any reference to the anti-freeze story. Therefore, we find that appellant suffered no prejudice from McGregor's comment.

{¶ 104} Next, appellant challenges McGregor's inference that she felt scared during her first encounter with appellant after Rosemarie's death and McGregor's opinion that there must have been something in the calcium pills taken by Rosemarie to cause appellant to flee the United States.

{¶ 105} Pursuant to Evid.R. 701, a lay witness's opinion testimony is limited to those opinions or inferences that are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue. *State v. Skidmore*, Mahoning App. No. 08 MA 165, 2010-Ohio-2846; Evid.R. 701.

{¶ 106} These statements were made to explain McGregor's state of mind in the days following Rosemarie's death and allowed the jury to understand why she expressed

her concerns that Rosemarie's death may have been related to her taking the calcium pills given to her by appellant. The statements were relevant and were not overly prejudicial. Further, McGregor's comment regarding appellant's flight did not amount to prejudice based on the trial court's subsequent instruction on flight to the jury.

### Michelle Stephens and Marguerite Montanez

{¶ 107} Defendant next complains of the testimony of both Michelle and Marguerite that they felt hatred and disgust toward him. Appellant did not object to this testimony and has waived all but plain error. See *State v. Tichon* (1995), 102 Ohio App.3d 758, 767, 658 N.E.2d 16. To constitute plain error, the error must be obvious on the record, palpable, and fundamental, so that it should have been apparent to the trial court without objection. Id. Moreover, plain error does not exist unless the appellant establishes that the outcome of the trial clearly would have been different but for the trial court's allegedly improper actions. *State v. Waddell* (1996), 75 Ohio St.3d 163, 166, 661 N.E.2d 1043. Notice of plain error is to be taken with utmost caution, under exceptional circumstances, and only to prevent a manifest miscarriage of justice. *State v. Phillips* (1995)*, 74 Ohio St.3d 72, 83, 656 N.E.2d 643.

{¶ 108} Based on the other evidence adduced at trial, we hold that the brief, general statements by Michelle and Marguerite that they despised and hated appellant were not outcome-determinative, and therefore the admission of the statements was not plain error.

### Gina Hasrouni

{¶ 109} Finally, appellant complains that a mistrial was proper after Gina Hasrouni testified that due to his behavior at her funeral, she believed that appellant had killed his

wife.  This response was immediately struck by the trial court, and the court gave the jury instructions to disregard the comment.  A jury is presumed to follow the trial court's instructions.  *Ahmed*, 103 Ohio St.3d 27, 2004-Ohio-4190, 813 N.E.2d 637.  Here, the trial court was in the best position to evaluate whether the testimony of Hasrouni deprived appellant of a fair trial, and its decision to deny appellant's request for a mistrial was not an abuse of discretion.

{¶ 110} Accordingly, appellant's fourth assignment of error is overruled.

## VI

{¶ 111} In his sixth assignment of error, appellant argues that the trial court improperly allowed the introduction of bad-acts testimony in violation of Evid.R. 404(B).  We disagree.

{¶ 112} Under Evid.R. 404(B), evidence of other crimes, wrongs, or acts is not admissible to prove a defendant's character as to criminal propensity.  It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

{¶ 113} Further, R.C. 2945.59 provides, "In any criminal case in which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing an act is material, any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding

that such proof may show or tend to show the commission of another crime by the defendant."

{¶ 114} Evidence of other acts by a defendant is admissible only when it tends to show one of the matters enumerated in the statute and rule and only when the evidence is relevant to prove that the defendant is guilty of the offense in question. *State v. Burson* (1974), 38 Ohio St.2d 157, 311 N.E.2d 526.

{¶ 115} Appellant points to four instances of testimony where "other acts" were improperly admitted by the trial court. He specifically challenges Khalife's testimony that appellant indulged in recreational drugs and prostitutes in Beirut; Cindy Page's testimony that appellant spoke derogatorily to his wife at a Christmas party; Firas's testimony that appellant gave his wife and other women a venereal disease; and McGregor's mention of a "disturbing story."

{¶ 116} As stated above, McGregor's mention of a "disturbing story" was properly objected to and stricken from the record. The objection was sustained, and McGregor was prevented from discussing any facts surrounding the disturbing story for the jury. Because McGregor never disclosed the actual acts surrounding the disturbing story, we cannot find a violation of Evid.R. 404(B).

{¶ 117} Additionally, we find that the admissibility of the evidence concerning appellant's giving other women a venereal disease is not barred by Evid.R. 404(B). The testimony was not admitted to show that appellant acted in conformity with prior bad acts. Rather, it was properly admitted as a rebuttal to appellant's elicitation of testimony that

he had acted discreetly in carrying on affairs and was generally a good husband. Therefore, the trial court did not abuse its discretion in admitting the testimony.

{¶ 118} Similarly, appellant's argument regarding the testimony of Cindy Page lacks merit because her testimony was used to rebut evidence presented by defense counsel that appellant and Rosemarie had a good marriage. Rebuttal evidence, the scope of which lies in the discretion of the trial court, is that which is given to "explain, refute, or disprove new facts introduced into evidence by the adverse party." *McNeill*, 83 Ohio St.3d at 446, 700 N.E.2d 596.

{¶ 119} During his case, appellant called Rosemarie's close friend, Katie Touhey, to testify that Rosemarie seemed happy in her marriage. Appellant used Touhey's testimony to present to the jury an impression of marital harmony. To rebut this evidence, the trial court allowed Cindy Page to testify to having been at an Akron General Hospital Christmas party with appellant, Rosemarie, and Page's Saudi Arabian husband. Page testified that Rosemarie witnessed the two men speaking Arabic together and asked Page's husband where he was from. In response, appellant told Rosemarie that "no one was talking to her." Page testified, "[appellant] told her to shut up and go sit down." Rosemarie, humiliated, put up no resistance, and just went and sat down.

{¶ 120} We find that Page's testimony did not fall within the Evid.R. 404(B) category of evidence. Rather, the testimony was proper rebuttal evidence used to refute and disprove the new facts introduced by defense counsel through the testimony of Touhey. Therefore, the trial court did not abuse its discretion by admitting the testimony of Page.

{¶ 121} Finally, appellant submits that Khalife's testimony that appellant indulged in recreational drug use and prostitutes during his time in Beirut was irrelevant and in violation of Evid.R. 404(B). In the absence of an objection, we limit our review of the prosecutor's comments to that standard established for plain error. In light of the other evidence adduced at trial, we hold that the brief, general statements by Khalife that appellant had engaged in irrelevant bad acts was not outcome-determinative, and therefore, the admission of the statements was not plain error. See *State v. Davis* (1996), 76 Ohio St.3d 107, 118, 666 N.E.2d 1099.

{¶ 122} Accordingly, appellant's sixth assignment of error is overruled.

## VII

{¶ 123} In his seventh assignment of error, appellant argues that the trial court erred when it allowed McGregor to testify about the conversation she had with Rosemarie just moments before Rosemarie's death.

{¶ 124} A trial court possesses broad discretion with respect to the admission of evidence, including the discretion to determine whether evidence constitutes hearsay and whether it is admissible hearsay. *State v. Graves*, Lorain App. No. 08CA009397, 2009-Ohio-1133, ¶ 4. Whether or not the declarant is available as a witness, Evid.R. 803(1) permits the admission of statements "describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter unless circumstances indicate lack of trustworthiness."

{¶ 125} Therefore, of "central [concern] to the admission of statements of present sense impression is the temporal proximity of statements to the event at issue. [This is so

because] 'the principle underlying this hearsay exception is the assumption that statements or perceptions describing the event and uttered [closely in time] to the event, bear a high degree of trustworthiness.' " *Graves,* 2009-Ohio-1133, at ¶ 4, quoting *Cox v. Olivers Mach. Co.* (1987), 41 Ohio App.3d 28, 37, 534 N.E.2d 855.

{¶ 126} The key to the statement's trustworthiness is the spontaneity of the statement; it must be either contemporaneous with the event or be made immediately thereafter. A minimal lapse of time between the event and statement indicates an insufficient period to reflect on the event perceived; the declarant's reflection would detract from the statement's trustworthiness. *State v. Ellington*, Cuyahoga App. No. 84014, 2004-Ohio-5036, ¶ 10. "When the statement is the 'product of reflective thinking rather than spontaneous perception,' Evid.R. 803(1) does not apply." *Graves* at ¶ 4, citing *State v. Simmons*, Summit App. No. 21150, 2003-Ohio-721, ¶ 35-36.

{¶ 127} The record reflects that Rosemarie indicated to McGregor that she was feeling nauseous and believed it was being caused by a calcium pill that appellant had told her to take earlier in the day. Rosemarie personally observed appellant give her the calcium pill, then personally experienced her own nausea setting in, all of which she recounted to McGregor as it was happening.

{¶ 128} Based upon the circumstances presented, this court cannot find that the trial court abused its discretion in admitting this testimony. McGregor's testimony related to the feeling of sickness that Rosemarie was suffering at the time she made the statement. Further, the proximity in time between appellant's giving Rosemarie the calcium pill and Rosemarie's statement indicates its trustworthiness. *State v. Travis*, 165

Ohio App.3d 626, 2006-Ohio-787, 847 N.E.2d 1237.   Therefore, McGregor's testimony was admissible pursuant to the present-sense-impression exception to the hearsay rules of evidence.

{¶ 129} Accordingly, appellant's seventh assignment of error is overruled.

## Expert Testimony

## VIII

{¶ 130} In his eighth assignment of error, appellant argues that the trial court erred when it allowed Gregg McCrary, retired Special Agent for the Federal Bureau of Investigation ("FBI"), to testify as an expert when his testimony invaded the sole province of the jury deciding this case.   Appellant submits that although McCrary was never directly asked to give his opinion about his special knowledge as a crime-scene analyst, he indirectly gave his opinion that appellant had a narcissistic personality and had staged his wife's death.   We disagree.

{¶ 131} McCrary worked as a special agent for the FBI for approximately 25 years.   During that time, he took several graduate courses in criminal justice, and he received a master's degree in psychological services.   He served his last ten years with the FBI in the behavioral-science unit, investigating cases and conducting research on violent criminal behavior to improve the operational effectiveness of the law-enforcement community.   According to McCrary, the behavioral-science unit was developed in order to understand how people commit crimes, what motivates them to commit crimes, and how they get away with committing crimes.

{¶ 132} The Ohio Supreme Court has clearly held that police officers may qualify as expert witnesses where they possess specialized knowledge that will assist the fact-finder. *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038. In *Drummond*, the court held that a police officer with specialized knowledge of gangs and gang symbols could properly testify as an expert. As in *Drummond*, McCrary's specialized knowledge regarding the staging of crime scenes was helpful to the fact-finder and relevant to the issues litigated throughout appellant's trial.

{¶ 133} At trial, McCrary was permitted to testify about his experience and specialization in the fields of crime-scene analysis, crime classification, and victimology. Specifically, McCrary discussed his knowledge and expertise with crime-scene "staging." McCrary defined staging as the "purposeful alteration of the crime or the crime scene to suggest some other motive, false motive." According to McCrary, offenders will stage a scene of a crime so that they will not immediately become the primary suspect.

{¶ 134} Appellant relies on this court's opinion in *State v. Garcia*, Cuyahoga App. No. 79917, 2002-Ohio-4179. In *Garcia*, the prosecution attempted to use McCrary as an expert witness; however, this court held that it was improper for McCrary to testify that in his expert opinion, the fire that had killed the defendant's children had had all the elements of being an arson for profit. In reaching that conclusion, this court held that such expert opinion testimony improperly invaded the jury's province. Id. However, the case at bar is distinguishable from *Garcia*. Here, McCrary did not offer any conclusions or opinions concerning appellant's possible motives in this case, and McCrary did not offer any opinions as to whether he believed appellant had staged

Rosemarie's death. Rather, McCrary merely explained the concept of "staging" and identified situations where staging may occur and why a defendant would attempt to stage a crime scene. We find that this information did not invade the jury's province. See *State v. Stevens* (Tenn.2002) 78 S.W.3d 817 (the Tennessee Supreme Court held that McCrary could testify about the staging of the crime scene, but was prohibited from testifying about the defendant's probable motives).

{¶ 135} Appellant also argues that it was improper for McCrary to define narcissistic personality disorder under the Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"). The DSM-IV is a book of all the major mental disorders or mental illnesses that psychologists and psychiatrists have defined over the years. Evid.R. 803(18) provides that the following is "not excluded by the hearsay rule": "To the extent called to the attention of an expert witness upon cross-examination or relied upon by the expert witness in direct examination, statements contained in published treatises, periodicals, or pamphlets on a subject of history, medicine, or other science or art, established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice. If admitted, the statements may be read into evidence but may not be received as exhibits." McCrary testified that he relied on the DSM-IV in his training and experience, and the definition of Narcissistic Personality Disorder was relevant to McCrary's testimony concerning the theory of "staging" and crime classifications. Pursuant to Evid.R. 803(18), we find that the trial court acted within its discretion when it allowed McCrary to define Narcissistic Personality Disorder under the DSM-IV.

{¶ 136} Appellant's eighth assignment of error is overruled.

**Manifest Weight**

**IX**

{¶ 137} In his ninth assignment of error, appellant argues that his conviction for aggravated murder was against the manifest weight of the evidence. We disagree.

{¶ 138} The court in *State v. Martin* (1983), 20 Ohio App.3d 172, 485 N.E.2d 717, has set forth the proper test to be used when addressing the issue of manifest weight of the evidence. *Martin* stated: "The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses, and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." Id. at 175. Moreover, it is important to note that the weight of the evidence and the credibility of the witnesses are issues primarily for the trier of fact. *State v. DeHass* (1967), 10 Ohio St.2d 230, 227 N.E.2d 212, paragraph one of the syllabus. The power to reverse a judgment of conviction as against the manifest weight must be exercised with caution and in only the rare case in which the evidence weighs heavily against the conviction. *Martin*.

{¶ 139} In determining whether a judgment of conviction is against the manifest weight of the evidence, in *State v. Wilson* (June 9, 1994), Cuyahoga App. Nos. 64442 and 64443, we adopted the guidelines set forth in *State v. Mattison* (1985), 23 Ohio App.3d 10, 490 N.E.2d 926, syllabus. These factors, which this court noted are in no way exhaustive, include (1) knowledge that even a reviewing court is not required to accept

the incredible as true; (2) whether evidence is uncontradicted; (3) whether a witness was impeached; (4) attention to what was not proved; (5)the certainty of the evidence; (6) the reliability of the evidence; (7) the extent to which a witness may have a personal interest to advance or defend [his or her]testimony; and (8) the extent to which the evidence is vague, uncertain, conflicting or fragmentary.

{¶ 140} A reviewing court will not reverse a verdict where the trier of fact could reasonably conclude from substantial evidence that the state has proved the offense beyond a reasonable doubt. *State v. Eley* (1978), 56 Ohio St.2d 169, 383 N.E.2d 132.

{¶ 141} R.C. 2903.01(A) states: "No person shall purposely, and with prior calculation and design, cause the death of another." Pursuant to R.C. 2901.22(A), "[a] person acts purposely when it is his specific intention to cause a certain result." Intent may be determined from the surrounding facts and circumstances. *State v. Johnson* (1978), 56 Ohio St.2d 35, 38, 381 N.E.2d 637. An intent to kill may be presumed when the natural and probable consequence of an act is to produce death, and the jury may conclude from the surrounding circumstances that there was an intention to kill. *State v. Robinson* (1954), 161 Ohio St. 213, 118 N.E.2d 517. It is presumed that a person intends the natural, reasonable, and probable consequences of his voluntary acts. *State v. Nabozny* (1978), 54 Ohio St.2d 195, 375 N.E.2d 784.

{¶ 142} Based on the forthcoming, we find that appellant's conviction was not against the manifest weight of the evidence.

{¶ 143} The record indicates that appellant was a prominent doctor who demonstrated his knowledge of cyanide poisoning by giving Grand Rounds courses at the

Akron General Hospital addressing the subject. He also had access to cyanide through his well-documented connections to the jewelry industry.

{¶ 144} The testimony of Firas established that just months before Rosemarie's death, appellant embarked on an affair with his mistress, Michelle. While dating Michelle, appellant sent her a Pajamagram proclaiming that "[n]ext Valentine's Day will be all ours." The evidence presented at trial indicates that in the days leading to Rosemarie's death, there were signs that she had confronted appellant about his affair. Analysis conducted on the Essa family computer found that two days before Rosemarie's death, someone in the home typed an Internet search for "Michelle Madeline." Testimony at trial proved that appellant was at work when this search was conducted. The night before her death, Rosemarie made a burst of telephone calls between 11:23 and 11:30 p.m. to appellant's cell phone, pager, and messaging service, followed by two longer telephone conversations around 2:00 a.m.

{¶ 145} Further, the record indicates that prior to leaving her home to meet her sister at the movie theater, Rosemarie was handed a calcium pill by the appellant, who insisted that she take it. While driving to the movie theater, Rosemarie called her long-time friend McGregor and confided to her that she thought the calcium pills were the cause of her current nausea.

{¶ 146} On March 17, 2005, four weeks after Rosemarie's death, appellant agreed to meet with Detective McKee. At trial, McKee stated that the interview was benign, routine, and nonaccusatory. In the course of that interview, McKee confiscated the calcium pills taken by Rosemarie on the day of her death. Within hours, appellant fled

the country and began a new life in Beirut, where he used forgery and disguises to maneuver throughout the country.

{¶ 147} Just days after appellant's flight from the United States, the Lake County Crime Lab inspected the calcium capsules that were retrieved from appellant's home and determined that nine of the 56 capsules tested contained cyanide. Appellant indicated that these were the pills that Rosemarie took on the day of her death, and the testimony of McGregor indicated that it was appellant who gave Rosemarie the calcium pill that morning. Thereafter, an additional toxicology screen performed by the Cuyahoga County Coroner's Office revealed 9.1 milligrams of cyanide per liter of Rosemarie's blood. As a result, the coroner's officer concluded that Rosemarie died of cyanide poisoning.

{¶ 148} Finally, Firas, Khalife, and Awad testified that appellant had personally admitted to each of them, on separate occasions, that he killed Rosemarie by putting cyanide in her calcium supplements.

{¶ 149} We are unable to conclude that this is the exceptional case in which the evidence weighs heavily against the conviction. The state presented competent, credible evidence to support the jury's determination that appellant purposely, and with prior calculation and design, caused the death of Rosemarie. The jury was in the best position to weigh the credibility of the witnesses brought before it, and we find that the jury did not clearly lose its way when it found appellant guilty of aggravated murder. Therefore, appellant's conviction for aggravated murder was not against the manifest weight of the evidence.

{¶ 150} Appellant's ninth assignment of error is without merit and is overruled.

**R.C. 2967.191**

**X**

{¶ 151} In his tenth assignment of error, appellant argues that the trial court erred when it failed to grant him credit for time served between the date of his arrest in Cyprus on October 7, 2006, and his arrival in the Cuyahoga County Jail on October 9, 2009.

{¶ 152} In *State v. Jordan* (Apr. 10, 2000), Cuyahoga App. No. 76488, this court held, "R.C. 2967.191 provides that a prison term shall be reduced by the number of days confined which arose out of the offense for which the prisoner was convicted and sentenced. Appellant is not entitled to credit for time served in another jurisdiction for another offense." Id. at 1, citing *State ex. rel. Gillen v. Ohio Adult Parole Auth.* (1995), 72 Ohio St.3d 381, 650 N.E.2d 454; *State v. McWilliams* (1998), 126 Ohio App.3d 398, 710 N.E.2d 729.

{¶ 153} In the case at bar, appellant was not arrested or held in Cyprus solely on the underlying aggravated-murder charge. Initially, the Cypriot National Police arrested appellant for violating Cypriot laws against using a false passport and impersonation. Appellant was then held pursuant to a federal "Unlawful Flight to Avoid Prosecution" warrant ("UFAP warrant"). The federal UFAP warrant remained pending during the entire period that appellant was imprisoned in Cyprus. Appellant has failed to demonstrate that he was held in Cyprus solely on the underlying charge. Therefore, the trial court did not err in denying his request for credit for time served for the time he spent fighting extradition charges in Cyprus.

**{¶ 154}** Accordingly, appellant's tenth assignment of error is overruled.

## Cumulative Errors

## XI

**{¶ 155}** In his 11th assignment of error, appellant argues that the cumulative errors that occurred in his case deprived him of a fair trial. We disagree.

**{¶ 156}** " 'It is true that separately harmless errors may violate a defendant's right to a fair trial when the errors are considered together. In order to find "cumulative error" present, we first must find that multiple errors were committed at trial. We then must find a reasonable probability that the outcome of the trial would have been different but for the combination of the separately harmless errors.' " *State v. Clark*, Cuyahoga App. No. 89371, 2008-Ohio-1404, ¶ 62, quoting *State v. Djuric*, Cuyahoga App. No. 87745, 2007-Ohio-413.

**{¶ 157}** Specifically, appellant contends that the multiple errors raised in his previously discussed assignments of error form the basis of his cumulative-errors argument. Based on our discussion in the previous assigned errors, we find that appellant was not denied his constitutional right to a fair trial. Consequently, having found no errors regarding appellant's pivotal complaints in this case, we find that the doctrine of cumulative errors is inapplicable.

**{¶ 158}** Accordingly, we overrule appellant's 11th assignment of error.

Judgment affirmed.

JONES and GALLAGHER, JJ., concur.

————————————

# APPENDIX

Appellant's Assignments of Error:

I. "The appellant was denied his rights to equal protection and due process under both the Ohio and United States Constitutions when the trial court failed to give a cautionary jury instruction regarding the testimony of Jamal Khalife and Firas Essa."

II. "The appellant was denied a fair trial in violation of the Fourteenth Amendment of the United States Constitution and Article I, Section 16 of the Ohio Constitution when the prosecutor engaged in misconduct during closing argument."

III. "The appellant was denied his constitutional right to a fair trial in violation of the Fourteenth Amendment of the United States Constitution and Article I, Section 16 of the Ohio Constitution when the prosecution elicited testimony from Firas Essa's attorney that Firas Essa testified truthfully."

IV. "The appellant's due process rights were violated when the trial court failed to declare a mistrial after the prosecution elicited inadmissible character and opinion testimony regarding the appellant."

V. "The trial court abused its discretion by allowing the State of Ohio [to] elicit testimony that the appellant had a venereal disease."

VI. "The appellant was denied due process of law and a fair trial when the trial court permitted evidence of other alleged bad acts pursuant to Evid.R. 404(B)."

VII. "The appellant's confrontation rights under the state and federal constitution were violated by the admission of hearsay statements of Rosemarie Essa through Eva McGregor."

VIII. "The trial court erred when it allowed a crime scene analyst to testify."

IX. "The conviction for aggravated murder was against the manifest weight of the evidence."

X. "The trial court miscalculated the appellant's jail time credit."

XI. "The cumulative errors that occurred in the appellant's case deprived him of a fair trial."