UNITED STATES of America,
Plaintiff–Appellee,

v.

Alvis COPELAND, Jr., Defendant–
Appellant.

No. 94–1268.

United States Court of Appeals,
Sixth Circuit.

Argued Jan. 30, 1995.

Decided March 31, 1995.

David Debold (argued and briefed), Office of the U.S. Atty., Detroit, MI, Mark C. Jones, Asst. U.S. Atty., Flint, MI, for plaintiff-appellee.

Arthur M. Fitzgerald (argued and briefed), Bay City, MI, for defendant-appellant.

Before: WELLFORD, BOGGS, and SILER, Circuit Judges.

WELLFORD, Circuit Judge.

Defendant Alvis Copeland, Jr., was convicted by a jury of one count of conspiring to distribute cocaine. The trial court concluded that between 1986 and 1993, Copeland distributed more than 1500 grams of cocaine base (crack). The district court concluded that this resulted in a base offense level of 38 under the guidelines, and sentenced Copeland to a total of 324 months incarceration.

Copeland raises many challenges on appeal, including allegations of jury misconduct and bias, improper admission of past criminal acts, improper admission of store receipts which demonstrated that he made expensive purchases under false names, and errors in sentencing. We conclude that any error that contributed to his conviction for conspiracy was harmless. We affirm the conviction, but remand for resentencing.

Because Copeland raises multiple claims based on distinct factual questions, we will discuss the relevant factual background as it pertains to each claim. As an initial matter, however, we hold that any of the alleged errors in this case would be harmless error because overwhelming evidence supports Copeland's conviction, even after discounting for each or all of the alleged errors.

For example, three co-conspirators testified against Copeland at trial. Rickey Bowie testified that he began selling drugs for Copeland in 1988 or 1989, and during a four-year relationship, he sold over 1000 grams of crack for which Copeland had been the source. Antonio Johnson stated that he began selling drugs with Copeland in 1990, and that on five or six occasions, he sold packages weighing four and a half ounces of various forms of cocaine. He added, however, that he distributed cocaine powder only twice, and that the remainder was crack.

Bryant Armour, another co-conspirator, testified about Copeland's violent efforts to extract punishment for drug deals gone awry. Armour and Copeland had been distributing cocaine together for several months in 1991. Copeland would supply Armour with drugs, which Armour would sell and then pay Copeland. In May, 1991, someone

allegedly stole $800 worth of drugs from Armour. Copeland became angry and, after spotting Armour in a phone booth later that day, fired at him with a revolver. Armour escaped unharmed, and then began cooperating with police. Armour also testified about crack which he distributed for Copeland, testifying that he sold between eight and nine ounces of crack.

## I. *JUROR MISCONDUCT OR BIAS*

■ Copeland alleges that the district court erred in not declaring a mistrial based on three incidents of potential juror misconduct or bias. Defense counsel, however, only asked for a mistrial after the first of these incidents.

The first incident occurred when juror Katrina Leonard, on the first day of the trial, asked a court employee whether jurors would be escorted to their cars after the trial was over. After the court room employee informed her that he did not think so, the juror responded "Well, so what are we going to do then, just find him guilty and run to the parking structure as far [sic] as we can?"

The court employee informed the court and the parties of this juror's concern, whereupon the defendant requested this juror be removed, or, alternatively, that a mistrial be declared. In response to this motion, the court questioned the juror (and other jury members) about any potential biases and to see if she was predisposed to convict. The district court determined that the juror was not predisposed to convict, based in part on her recollection that she had asked the question conditionally (*if* we convict ...) rather than as a matter of fact (*when* we convict ...). The court also instructed the jury that they should not be concerned for their safety. As a practical matter, however, this juror did not participate in deliberations, because both parties agreed to replace her with an alternate juror for deliberations. The defense did not object to the court's actions, nor did the defense request the trial judge take further action after the court declined to declare a mistrial.

The defendant points to two jurors' comments about a witness' earring as a second source of potential juror bias. From the information the parties provided (we do not have the complete portion of the transcript on this issue), a deputy clerk overheard two jurors talking about various witnesses, "stating who they liked" and that they especially liked one of the witnesses' earring. The defendant concedes that the deputy clerk testified that she had not heard the jurors discussing any witness' testimony. In this regard, the district court gave a cautionary instruction to the jury to refrain from discussing the case, which was the only remedy the defense requested.

The third juror concern arose after defense counsel learned that an observer in the courtroom was a relative of a juror, and that this relative had witnessed courtroom proceedings that were conducted outside the jury's presence. The defendant voiced concern that this observer could be sharing information with members of the jury. He concedes, however, that there was no proof of such an exchange of information and that the district court warned the observer not to discuss court proceedings with any member of the jury. In addition, the court had previously warned members of the jury not to discuss the case until deliberation had begun.

■ The trial judge is in the best position to determine the nature of the alleged jury misconduct, and we, therefore, review his decision under the abuse of discretion standard. *United States v. Shackelford,* 777 F.2d 1141, 1145 (6th Cir.1985), *cert. denied sub nom. Brooks v. United States,* 476 U.S. 1119, 106 S.Ct. 1981, 90 L.Ed.2d 663 (1986). The district court is also in the best position to determine appropriate remedies for any demonstrated misconduct. We apply this same abuse of discretion standard when reviewing the district court's decision whether to grant a mistrial after the first alleged juror incident.

We cannot conclude that the trial judge abused his discretion in respect to any juror misconduct. Whether taken individually or collectively, the district court's rulings were not erroneous and we find no real evidence of any participating juror's bias or prejudice. In each circumstance, the trial judge investigated the merits of the charge and rendered

the appropriate cautionary instructions. *See id.* (holding that when evidence of potential misconduct is brought to the trial judge's attention, he has a "duty to investigate whether there may have been a violation of the sixth amendment.") As to the first incident of juror misconduct, the juror was removed prior to deliberations, and thus, the defendant suffered no prejudice. As to allegations two and three, the defense failed to show that any misconduct or bias occurred. Even so, the district court gave the cautionary instructions that the defense counsel requested. We hold that the district court did not abuse its discretion in investigating and remedying these allegations of juror misconduct or bias.

## II. *EVIDENCE OF COPELAND'S PAST WEAPONS ARREST*

■ Copeland raises three arguments on appeal regarding the introduction of his 1988 weapons arrest. First, he argues that this evidence was inadmissible under Rule 403 of the Federal Rules of Evidence because it was more prejudicial than probative. Second, he alleges that his 1988 arrest should be excluded under the Fourth Amendment because the officer lacked reasonable suspicion for making a *Terry* stop at the time of his arrest. Third, he argues that his arrest should be excluded because the officer lacked statutory authority to arrest him because the officer was outside his jurisdiction.

In the early morning hours of April 30, 1988, Flint police received a call about a drive-by shooting into a residence. The occupants of the home and their neighbors gave Copeland's name as a suspect, and described his car (a blue Mercedes) and his license plate number (856 TWS). At approximately 2:30 a.m., Officer Harlon Green spotted Copeland in his car with a young, female passenger at a gas station in Mt. Morris Township, a nearby suburb of Flint, Michigan. When approaching Copeland's car, the officer noticed a partially consumed beer between the passenger's legs. The officer arrested her for juvenile delinquency, and also arrested Copeland for contributing to the delinquency of a minor. In the process of these arrests, the police noticed a loaded firearm next to the defendant's seat.[1] Copeland was never prosecuted for either the contributing to the delinquency of a minor or the gun charge, but his parole was revoked.

At trial, the jury was not told about the drive-by shooting incident; the jury did, however, hear evidence that Copeland had been arrested for possession of a loaded firearm. We review the district court's decision to admit this evidence under the abuse of discretion standard, applying the standards enunciated in Rules 403 and 404 of the Federal Rules of Evidence. Rule 404(b) provides that

> Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. . . .

The list of permissible purposes for admitting "bad acts" evidence is not exhaustive, and we have held that the rule is one of inclusion rather than exclusion. *United States v. Blakeney*, 942 F.2d 1001, 1018 (6th Cir.1991), *cert. denied*, 502 U.S. 1035, 112 S.Ct. 881, 116 L.Ed.2d 785 (1992).

The government offers two rationales for seeking to introduce Copeland's 1988 weapon arrest: 1) firearms and ammunition are tools of drug trafficking trade, and, therefore, it was likely that Copeland at the time was a drug dealer; 2) the 1988 arrest corroborates co-conspirator Bryant Armour's testimony that drug dealers, with no other source of income and facing possible retaliation from their competition, often carry guns to protect themselves and that Copeland had used a pistol against him in retaliation for a soured drug deal. The district court rejected the government's first argument ruling that the evidence did not tend to prove the drug conspiracy. The district court, however, admitted the evidence under the theory that it

---

1. Apparently, Copeland was never told he was under arrest or taken into physical custody until the loaded weapon was discovered.

corroborated Armour's testimony about his experience with Copeland while dealing cocaine. There was no direct link between the drug conspiracy and the weapons charge.[2]

It is a close question whether this evidence was sufficiently specific to corroborate Armour's testimony. In *United States v. Blakeney*, 942 F.2d 1001, 1018–19 (6th Cir.1991), we held that Rule 404(b) does not prohibit the admission of similar bad acts for corroboration purposes, provided that the "corroboration is direct and the matter corroborated is significant." The government argues that the 1988 weapons arrest corroborated Bryant Armour's testimony that Copeland had shot at him. We conclude that Copeland's arrest in 1988 for possessing a weapon is not too attenuated to corroborate Armour's testimony that he was attacked by Copeland with a pistol in 1991. *United States v. Baker*, 855 F.2d 1353, 1358 (8th Cir.1988), *cert. denied*, 490 U.S. 1069, 109 S.Ct. 2072, 104 L.Ed.2d 636 (1989).

■ Even if it were error for the district court to have admitted into evidence Copeland's 1988 weapons arrest in Copeland's drug conspiracy trial, we conclude that this error was harmless. *See* Fed.R.Crim.P. 52. The government presented convincing evidence from three former co-conspirators that they had sold drugs for Copeland. Copeland had the opportunity to cross-examine the police officer and to establish that the weapons charge was dropped, but chose not to do so. We find no prejudicial error with regard to admission of this testimony.

■ Copeland also claims that the 1988 arrest should have been suppressed as violative of his Fourth Amendment rights. Copeland argues that the police officer had no reasonable suspicion for the *Terry* stop in

detaining him at the gas station. We disagree. The occupants of the residence and several neighbors had listed Copeland as a suspect, described his car, and accurately recited the characters of his license plate. The arresting officer was aware of this information as it had been relayed to him over the police radio. This information was more than sufficient to provide the officer with reasonable suspicion for a *Terry* stop (if not probable cause to arrest for the drive-by shooting).

As to the defendant's third challenge, we need not discuss whether the Flint police, in 1988, were acting outside their jurisdiction at the time of the arrest. The government has provided a rather convincing argument that the arrest was not illegal under Michigan's "citizen's arrest" statute. Moreover, Michigan courts have distinguished between constitutionally invalid and statutorily invalid arrests, and have refused to apply the exclusionary rule to statutory violations such as the one alleged by Copeland. *Michigan v. Burdo*, 56 Mich.App. 48, 223 N.W.2d 358 (1974). *See also United States v. Layne*, 6 F.3d 396 (6th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1374, 128 L.Ed.2d 51 (1994) (interpreting Tennessee law).

## III. SHOULD THE DISTRICT COURT HAVE GIVEN, SUA SPONTE, A CAUTIONARY INSTRUCTION?

■ Defendant argues the district court committed reversible error by not giving, *sua sponte*, a cautionary instruction regarding testimony that implied Copeland had previously spent time in jail. At trial, the defendant neither moved to strike this testimony nor requested the court to give a curative instruction.[3] We therefore will review only

---

2. Although the arrest did occur during the period of the alleged conspiracy, no drugs were found on Copeland at the time of the weapons arrest.

3. Defendant claims that he did not object to the witnesses' testimony because he did not want to highlight the inference that he had previously been in jail. Alternatively, Copeland also claims to have made a standing objection to these references.

From what defendant provides in his brief, however, it does not appear that his standing

objection was directed to the unsolicited comments about Copeland's past jail experience:

> Mr. Jones [the prosecutor] in his direct has been inquiring as to the reputation on the street, various sources, et cetera. By the time I get my objections out, he's made the point with the jury. I would ask that I'm on a standing objection to that type of question, and I would ask you to instruct him not to do that,....

In any event, defendant did not request the court to provide a cautionary instruction to the jury.

for plain error, and will reverse only if errors were "so rank that they should have been apparent to the trial judge without objection, or that strike at fundamental fairness, honesty, or public reputation of the trial." *United States v. Evans*, 883 F.2d 496, 499 (6th Cir. 1989). The alleged errors do not fall into this category.

The controversy springs from unsolicited comments made by Copeland's former co-conspirators. The prosecutor asked Rickey Bowie what type of cars Copeland drove, and asked specifically when a Mercedes–Benz car was purchased. Bowie responded: "It was after he [referring to Copeland] first got out of jail."[4] Co-conspirator Antonio Johnson also remarked about Copeland's previous jail experience when asked how he had become involved with Copeland in distributing drugs. Johnson responded: "It wasn't—we just started hanging together for about a week after he came home from jail. And it just—eventually just got to be partners with him."[5]

The district court did not err in failing to give a *sua sponte* warning to the prosecution about these remarks, as they were unsolicited. As discussed above, the defense counsel's standing objection did not relate to these comments. The government was not responsible for unsolicited remarks made by its witnesses, absent special circumstances not apparent here.

Nor did the district court err by failing to issue *sua sponte* a curative instruction to the jury. The defense claims that it did not raise an objection to these comments because "[t]o directly object each and every time would have only emphasized the prejudicial matter." Arguably, a curative instruction would have emphasized this testimony, and, therefore, would have deprived the defense of its chosen trial strategy. Not issuing the instructions *sua sponte* under these circumstances was not reversible error.

## IV. INTRODUCTION OF CAR REPAIR RECEIPTS SHOWING THAT COPELAND USED AN ALIAS

On appeal, Copeland contests the government's introduction of store receipts that indicated the use of aliases during the course of the conspiracy. The receipts also showed that Copeland had bought approximately $5,000 in stereo equipment over a twenty-six month conspiracy period. Copeland indicated no source of income during this period.

Two possible arguments are available to challenge this evidence. First, one could argue that these receipts were hearsay, because these receipts were out of court statements offered for the truth of the matter asserted (*i.e.*, that Copeland used false names and made many purchases without a legitimate source of income). This argument would fail, however, as these receipts fall within the business records exception because they are records normally kept in the operation of a business and were supported by the testimony of the car repair shop's custodian of records. *See* Fed.R.Evid. 803(6).

The real issue is whether this evidence is relevant. Copeland claims to have objected to the introduction of this evidence. We believe that defendant did not properly object to this evidence other than to provide possible reasons other than drug dealing, that may have motivated him to use false names. In fact, defendant conceded the relevancy of the records to show that Copeland had spent considerable amounts of money without a legitimate source of income:

> I'm not gonna argue with the first two points. I think these are legitimate points to bring up. I'm suggesting that to now

---

The only request was that the court instruct the government's counsel to frame his questions in a certain way.

4. Bowie's answer may have been inaudible as defense counsel asked that the answer be repeated. The defense counsel, however, did not object after hearing the response.

5. Again, the jurors may have not heard his comments as the court instructed Johnson to move the microphone closer and Copeland's defense counsel asked that the answer be repeated. Johnson did *not* make a reference to jail in the repeated answer.

bring in the fact, as I guess another bad act, that he used different names, I'm suggesting to the court that there are numerous reasons for doing that that have absolutely nothing to do with a conspiracy.... So I guess I don't have an objection as to the gentleman from Duke's Stereo coming and testifying, if he can do so, that my client was there and spent money there, and had actual cash on his person, and there's no indication that he had any legitimate source of income. I think that is permissible.

Defendant did not specifically identify his objection to the relevancy of the receipts nor provide the district court with authority to support any objection.

"[W]hen a party fails to object to evidence at the trial court, his contention on appeal will prevail only if the trial court's evidentiary decision was plainly erroneous, thus affecting his substantial rights and resulting in a miscarriage of justice." *United States v. Evans*, 883 F.2d 496, 499 (6th Cir.1989).

We have had occasion to address the relevancy of financial information such as store receipts in a drug conspiracy case. In *United States v. Carter*, 969 F.2d 197, 200–01 (6th Cir.1992), we held the district court abused its discretion in admitting store receipts reflecting the purchase of approximately $3000 worth of appliances. *Carter* held that the admission of this evidence was reversible error. As in the present case, the government in *Carter* was attempting to show that the defendant had made expensive purchases without a legitimate source of income.

We find *Carter*, however, to be distinguishable here in several respects. First, there is indication that Carter made prompt and specific objection to the contested evidence. Second, the court referred to Carter's purchase of "a few appliances over a two-year period." Third, Copeland bought the items under a false name or names, unlike Carter. *See United States v. Okayfor*, 996 F.2d 116, 120 (6th Cir.), *cert. denied*, — U.S. —, 114 S.Ct. 238, 126 L.Ed.2d 192 (1993) (evidence of false documentation and use of alias "is relevant as proof of consciousness of guilt"). Some of the receipts in this case, moreover, tied Copeland to certain automo-

biles referred to in testimony related to the drug conspiracy period. Under the circumstances, we find no prejudicial error in the admission of the numerous cash receipts in this case. Although harmful to defendant, the proof was relevant and we find no abuse of discretion under Fed.R. of Evid. 403 in admitting it.

## V. *FAILURE TO FILE INCOME TAX RETURNS*

■ The prosecution in this case introduced evidence at trial that Copeland failed to file any income tax returns during the relevant period. Defendant maintains that this evidence was impermissibly and prejudicially tendered to show Copeland to be a bad person generally and guilty of other offenses. The government did not address this issue in its brief. The defendant argues, moreover, that during a substantial portion of the years involved he was in jail on other criminal offenses, and had no income for which he was required to file a return. Although the defendant did not object to this evidence at trial, we share defendant's legitimate concern about this type of proof. A failure to file income tax returns under the circumstances of this case is irrelevant. There was no showing of large amount of cash (or other property) possessed by Copeland nor any showing of an excessive or opulent lifestyle. Although we do not approve of this manner of evidentiary overkill, we believe the admission of this evidence to be harmless error. *See United States v. Carter*, 969 F.2d 197 (6th Cir.1992) (holding that presenting evidence of defendant's failure to file tax returns in his drug trial was reversible error).

## VI. *SENTENCE*

■ The district court determined that Copeland's offense level was 38, based on its conclusion that he had personally handled over 1500 grams of crack. On appeal, both parties concede the district court erred in determining the amount of crack Copeland handled, and therefore, ask that this case be remanded for resentencing. We agree that a remand is necessary, but we do not, in taking this action, suggest that the sentence must necessarily be reduced.

Proof of drug quantity need only be proved by preponderance of the evidence. *Id.* The guidelines treat crack differently from cocaine powder. *See* U.S.S.G. § 2D1.1. The district court adopted the factual findings contained in the presentence report when it determined that Copeland should be sentenced under the range of sentences imposed for a base offense level of 38. The presentence report, however, does not support this level. The presentence report calculated the amount of crack based on the testimony of two witnesses (Rickey Bowie and Antonio Johnson). Bowie testified that he had provided more than 1000 grams of crack to Copeland.

Antonio Johnson's testimony, however, does not account for an additional five hundred grams. Johnson testified that on five or six occasions, Copeland fronted him four-and-a-half ounces of cocaine, and that it was sometimes cocaine powder and sometimes crack. The district court apparently treated all of this as crack. As the government's brief demonstrates, if Johnson sold drugs for Copeland five times (a conservative estimate) and three of these sales were crack sales, this amounts to less than 385 grams. The district court's determination that Copeland handled 1500 grams, based on testimony of these two witnesses only, is clearly erroneous.

On remand, however, the district court may look to the testimony of Bryant Armour, and any others who may bear upon the amount of crack involved. In any event, we remand for resentencing without making a determination as to the base offense level that should be assigned.

## VII. *CONCLUSION*

For the reasons indicated, we **AFFIRM** the conviction of Copeland and find no reversible error in any of his assignments of error with respect to a determination of guilt. We **REMAND** this matter to the district court for resentencing.