[Cite as *State v. Logan*, 2012-Ohio-1944.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 97022**

## STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

## MONTEZ LOGAN

DEFENDANT-APPELLANT

### JUDGMENT:
### AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-540250

**BEFORE:** Kilbane, J., Blackmon, A.J., and S. Gallagher, J.

**RELEASED AND JOURNALIZED:** May 3, 2012

**ATTORNEY FOR APPELLANT**

Thomas A. Rein
Leader Building, Suite 940
526 Superior Avenue
Cleveland, Ohio 44114

**ATTORNEYS FOR APPELLEE**

William D. Mason
Cuyahoga County Prosecutor
Sanjeev Bhasker
Mahmoud Awadallah
Assistant County Prosecutors
The Justice Center - 9th Floor
1200 Ontario Street
Cleveland, Ohio 44113

MARY EILEEN KILBANE, J.:

{¶1} This appeal is a companion case arising out of the same events as contained in *State v. Allen*, 8th Dist. No. 97014, 2012-Ohio-1831.

{¶2} Defendant-appellant, Montez Logan ("Logan"), appeals his convictions and sentence for aggravated murder and attempted aggravated murder. Finding no merit to the appeal, we affirm.

{¶3} In August 2010, Logan and codefendant, Demetrius Allen ("Allen"), were charged in a seven-count indictment. Count 1 charged each of them with the aggravated murder of Miley Slaughter ("Slaughter"), and carried seven course-of-conduct specifications and one- and three-year firearm specifications. Count 2 charged each of them with the aggravated murder of Kenneth Green ("Green") and carried seven course-of-conduct specifications and one- and three-year firearm specifications. Count 3 charged each of them with the attempted aggravated murder of Timothy Sisson ("Sisson") and carried one- and three-year firearm specifications. Count 4 charged each of them with the attempted aggravated murder of Antwon Weems ("Weems") and carried one- and three-year firearm specifications. Count 5 charged each of them with the attempted aggravated murder of Willie Tyson ("Tyson") and carried one- and three-year firearm specifications. Count 6 charged Logan with having a weapon while under disability, and Count 7 charged Allen with having a weapon while under disability.

**{¶4}** The matter proceeded to a joint jury trial on May 23, 2011, at which the following evidence was adduced.

**{¶5}** On July 17, 2010, Slaughter, Green, Sisson, Weems, and Tyson were socializing outside of Eric Brown's ("Brown") house located near the intersection of East 123rd Street and Signet Avenue in Cleveland. The five men were gathered by Sisson's car, which was parked on the street. Tyson and Green were sitting on milk crates on the sidewalk near Sisson's car and in front of Brown's house. At approximately 8:30 p.m., the group of men were ambushed by two men, later identified as Logan and Allen.

**{¶6}** Brown testified that he observed Slaughter, Green, Sisson, Weems, and Tyson outside his home on the evening of July 17, 2010. He then heard gunshots and looked outside from his front window. He observed Allen running across the sidewalk and Brown's lawn, shooting an "SK" or "AK" automatic gun. Slaughter was shot and fell on his back, landing on Brown's driveway. Tyson and Green then ran up Brown's driveway. Allen stood over Slaughter, told him "I got your bitch ass[,]" and shot Slaughter again. Brown then pulled his front curtain shut and got down on the floor. Once the gunfire ceased, Brown went outside and observed Slaughter dead in his driveway. Brown also observed Green lying down in his backyard. Brown took off his shirt and applied pressure to Green's wounds until the paramedics arrived.

**{¶7}** Brown testified that he did not observe Logan shoot anyone, but that Logan had something in his hand. Brown could not see what it was because he could only see Logan from his chest up. He further testified that Logan acted together with Allen.

Brown testified that Logan was "hyped up shooting * * * Logan * * * was like yeah, yeah, yeah. You could tell they were together. They were the only two out there." Brown further testified that he heard more than 15 gunshots that night.

{¶8} Brown recognized Allen from the neighborhood, but did not know his name. Initially, Brown was hesitant to speak with the police. Brown did not want to be labeled a "snitch." However, Brown eventually spoke with the police. Brown identified both Allen and Logan as the assailants in a photo array and in court.

{¶9} Weems testified that he was leaning on Sisson's car when he heard gunshots. He was shot in his right foot and ran away in the same direction as Sisson. He testified that he saw Allen with a gun. He further testified that he observed Slaughter fall to the ground. Weems testified that he knew Logan and Allen. Weems went to high school with Logan and knew the mother of Allen's child. Weems testified that initially he was hesitant to speak with the police, indicating that he wanted to avenge the crime himself. However, Weems eventually gave a statement to the police and identified both Allen and Logan as the assailants in a photo array and in court.

{¶10} Sisson testified that the five of them were gathered outside his car when he heard gunshots. At first, he heard three gunshots, then he heard a rapid succession of gunshots. He observed Allen with a gun. Slaughter was shot and lying on the ground. Weems was also shot. Sisson testified that Weems's "foot was shot off." Sisson ran away from the gunfire. He testified that his foot was grazed by a bullet and that he had to go to the hospital for treatment.

{¶11} Tyson testified that both Logan and Allen began shooting at them. Tyson and Green tried to escape by running up Brown's driveway, but Green was shot and could not keep up with Tyson. Tyson hid in a neighbor's garage until the gunfire ceased. When he returned to the scene, he found Slaughter dead in Brown's driveway and Green lying on the ground in Brown's backyard.

{¶12} Logan and codefendant Allen both testified on their own behalf. Logan testified that Allen and he are like brothers. On July 17, 2010, they picked up Allen's brother, Deandre Allen ("Deandre"), and Deandre's friend, Dapolo Green ("Dapolo"), at East 118th Street and Kinsman. Allen was driving a van. The four of them went to a shoe store located at the intersection of Harvard and Lee Road. They were at the shoe store for approximately 30 minutes. Allen and Logan then drove Deandre and Dapolo back to Allen and Deandre's home in Garfield Heights. After that, they drove to a liquor store and returned to their friend's house on East 93rd and Aetna in Cleveland. Logan testified that he heard about the shooting after he arrived at his friend's house. His friend received a call around 9:00 p.m. and relayed the information to Allen and Logan. Logan denied shooting at the victims, testifying that Allen and he were selling drugs that night and making money.

{¶13} Allen also testified that Logan and he picked up Deandre and Dapolo at East 118th Street and Kinsman around 6:30 p.m. The four of them went to a shoe store for approximately 30 minutes. Allen and Logan then drove Deandre and Dapolo back home in Garfield Heights at approximately 8:00 p.m. After that, they stopped at a liquor store

before 9:00 p.m. and returned to their friend's house on East 93rd and Aetna. Allen also testified that he heard about the shooting after he arrived at his friend's house. Allen also denied shooting at the victims, testifying that Logan and he were selling drugs that night and making money.

{¶14} Deandre testified as an alibi witness. Deandre testified that on July 17, 2010, Deandre and Dapolo, who is Green's cousin, met Allen and Logan around 6:30 p.m. at East 118th Street and Kinsman. Allen drove Logan, Deandre, and Dapolo to the shoe store around 7:00 p.m., where they stayed for a half-hour. Allen and Logan then drove Deandre and Dapolo back to Garfield Heights around 8:30 p.m. Deandre testified that neither Allen nor Logan were outside of his presence from the time they met at the shoe store until they dropped him off back home. Deandre denied riding a bicycle by Cook's house on July 16, 2010. He further denied speaking with Dapolo that day, advising Dapolo that Allen and his friends are going to come and "shoot the block up."

{¶15} On cross-examination, Deandre admitted that he was only with Allen and Logan for a short time on the night in question. Deandre testified that the first time he saw Allen and Logan that day was at 6:30 p.m. He further testified that he did not see them again that night after they brought him back home at approximately 8:20 p.m.

{¶16} The State called Dapolo as a rebuttal witness. Dapolo testified that on July 16, 2010, he was gathered outside Cook's house with Green, Slaughter, Tyson, and Weems when Deandre came by riding a bike. Deandre asked to speak with Dapolo. After they spoke, Dapolo returned to Cook's house and spoke with Green and Slaughter.

Dapolo testified that On July 17, 2010, he met up with Deandre at East 118th and Kinsman, where Allen and Logan picked them up and took them to the shoe store. They were at the shoe store for about half hour and then they drove back to Allen and Deandre's home. Dapolo then walked to the corner store and returned back to Deandre's house. When he returned, Deandre was the only one there, Allen and Logan had left.

{¶17} At the conclusion of trial, the jury found Logan guilty of all charges and specifications. The trial court merged the one- and three-year firearm specifications for purposes of sentencing. The trial court sentenced Logan to three years in prison on the firearm specification in Count 1, to be served prior and consecutive to 20 years to life in prison on the base charge of aggravated murder, and three years on the firearm specification in Count 2, to be served prior and consecutive to 20 years to life on the base charge of aggravated murder. The trial court sentenced Logan to three years on the firearm specification in each of Counts 3, 4, and 5, to be served prior and consecutive to three years on the base charge of attempted aggravated murder. The trial court also sentenced Logan to one year in prison on Count 6 (having a weapon while under disability). The court ordered that Counts 1 and 2 run consecutively to each other and that Counts 3, 4, 5, and 6 run concurrently, for a total of 46 years to life in prison.

{¶18} Logan now appeals, raising the following five assignments of error for review, which shall be discussed together where appropriate.

ASSIGNMENT OF ERROR ONE

The trial court erred in denying [Logan's] motion for acquittal as to the charges when the State failed to present sufficient evidence against [Logan].

ASSIGNMENT OF ERROR TWO

[Logan's] convictions are against the manifest weight of the evidence.

ASSIGNMENT OF ERROR THREE

[Logan] was denied a fair trial and his right to due process by at least one juror sleeping during the testimony and the court not properly dealing [with the issue] when it was brought to its attention.

ASSIGNMENT OF ERROR FOUR

[Logan] was denied a fair trial by the prosecutor's closing argument.

ASSIGNMENT OF ERROR FIVE

The trial court erred by ordering convictions and a consecutive sentence for separate counts of aggravated murder and attempted aggravated murder because the offenses are allied offenses pursuant to R.C. 2941.25 and they are part of the same transactions under R.C. 2929.14.

Sufficiency and Manifest Weight of the Evidence

{¶19} In the first assignment of error, Logan argues that the State failed to present sufficient evidence to sustain his convictions. In the second assignment of error, he further argues that his convictions are against the manifest weight of the evidence.

{¶20} The Ohio Supreme Court in *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, ¶ 113, explained the standard for sufficiency of the evidence as follows:

Raising the question of whether the evidence is legally sufficient to support the jury verdict as a matter of law invokes a due process concern. *State v. Thompkins* (1997), 78 Ohio St.3d 380, 386, 678 N.E.2d 541.   In reviewing such a challenge, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."   *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus, following *Jackson v. Virginia* (1979), 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560.

{¶21} With regard to a manifest weight challenge, the Ohio Supreme Court in *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, has stated that,

> the reviewing court asks whose evidence is more persuasive — the state's or the defendant's?   * * * "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony."   [*Thompkins* at 387], citing *Tibbs v. Florida* (1982), 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652.

{¶22} Moreover, an appellate court may not merely substitute its view for that of the jury, but must find that "'in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'"   *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 485 N.E.2d 717 (1st Dist.1983). Accordingly, reversal on manifest weight grounds is reserved for "'the exceptional case in which the evidence weighs heavily against the conviction.'" *Id.*, quoting *Martin*.

{¶23} Logan argues that the evidence was insufficient to establish that he was involved in the shooting.   He claims that the shooting was in retaliation for an incident at

a gas station the night before, where Slaughter and Green allegedly got into a fight with an individual named "Arsenio." Logan claims there is no evidence linking him with the gas station incident. He further argues that there is no evidence linking him with the shooting, relying on the fact that none of the witnesses testified that Logan had a gun at the scene.

{¶24} We note that the State proceeded on the theory that Logan was a principal offender, or alternatively, that he aided and abetted codefendant Allen. The trial court instructed the jury in relevant part that:

> It is alleged that [Logan] aided and abetted [Allen] in the commission of an aggravated murder. An aider and abettor is when two or more persons have a common purpose to commit a crime and when one does one part and the other does the other part.
>
> * * *
>
> When two or more persons have a common purpose to commit a crime and one does one part and a second performs another, those acting together are equally guilty of that crime.

{¶25} A person aids or abets another when he supports, assists, encourages, cooperates with, advises, or incites the principal in the commission of the crime and shares the criminal intent of the principal. *State v. Sekic*, 8th Dist. No. 95679, 2011-Ohio-4809, ¶ 27, citing *State v. Johnson*, 93 Ohio St.3d 240, 245-246, 2001-Ohio-1336, 754 N.E.2d 796. "Such intent may be inferred from the circumstances surrounding the crime." *Johnson* at 246.

{¶26} "In order to constitute aiding and abetting, the accused must have taken some role in causing the commission of the offense." *State v. Langford*, 8th Dist. No.

83301, 2004-Ohio-3733, ¶ 20, citing *State v. Sims*, 10 Ohio App.3d 56, 460 N.E.2d 672 (8th Dist. 1983). The mere presence of the accused at the scene of the crime is not sufficient, without more, to prove that the accused was an aider and abettor, even if the accused has knowledge of the commission of the crime. *Sekic* at ¶ 27, citing *State v. Cummings*, 10th Dist. No. 90AP-1144, 1992 WL 82783 (Apr. 21, 1992), and *State v. Widner*, 69 Ohio St.2d 267, 269, 431 N.E.2d 1025 (1982). The accused must have had some level of active participation by way of providing assistance or encouragement. *State v. Nievas*, 121 Ohio App.3d 451, 456, 700 N.E.2d 339 (8th Dist.1997); *Sims* at 58.

{¶27} "Aiding and abetting may be shown by both direct and circumstantial evidence, and participation may be inferred from presence, companionship, and conduct before and after the offense is committed." *State v. Cartellone*, 3 Ohio App.3d 145, 150, 444 N.E.2d 68 (8th Dist.1981), citing *State v. Pruett*, 28 Ohio App.2d 29, 34, 273 N.E.2d 884 (4th Dist.1971).

{¶28} In the instant case, Brown, Weems, Tyson, and Sisson testified that both assailants acted together during the ambush. Brown and Weems both identified Logan as one of the assailants. Brown had a clear view of the incident through his front window. Brown testified that Logan had something in his hand. He could not see what it was because he could only see Logan from his chest up. He further testified that Logan acted together with codefendant Allen. Brown testified that Logan was "hyped up shooting * * * Logan * * * was like yeah, yeah, yeah. You could tell they were together. They were the only two out there."

{¶29} Weems testified that he went to high school with Logan and recognized his face. He also knew the mother of Allen's child. He remembered Logan's name the following day. Additionally, both Brown and Weems identified Logan as the assailant in separate photo arrays, stating that they had "no doubt." Their testimony was corroborated by Brown's neighbor, Vanessa Watkins, who testified that she observed two young black males running away from the scene, with one of the males holding a gun in his hand.

{¶30} While Logan asserts the shooting was in retaliation for the fight at a gas station involving Slaughter, Green, and Arsenio, the evidence at trial indicates otherwise. Sisson testified that when the police asked him about Arsenio and the fight at the gas station, he told the police that the fight "had nothing to do with what happened because who was fighting, they were like friends and associates, so therefore, that was like a little incident." Furthermore, Detective Everett showed Brown a photo array with Arsenio's picture, but Brown did not indicate that anyone from that array was involved in the shooting.

{¶31} Moreover, Logan, and codefendant Allen offered a weak alibi. Deandre admitted on cross-examination that he was only with Allen and Logan for a short time on the night in question. Deandre testified that the first time he saw Allen and Logan that day was at 6:30 p.m. He further testified that he did not see them again after they brought him back home at approximately 8:20 p.m. Additionally, Logan's own

testimony confirmed that he was with Allen on the night of the shooting and that he went to high school with Weems.

{¶32} Thus, when viewing the evidence in the light most favorable to the State, we find that the State presented sufficient evidence that Logan aided and abetted Allen in the commission of the crimes against Slaughter, Green, Sisson, Weems, and Tyson.

{¶33} Logan further argues his convictions are against the manifest weight of the evidence. He does not challenge a specific conviction, rather he argues the jury lost its way. He attacks the credibility of Brown and Weems, referencing their previous felony records and claiming that their testimony was inconsistent because they did not initially cooperate with the police.

{¶34} We recognize that

'[t]he determination of weight and credibility of the evidence is for the trier of fact. The rationale is that the trier of fact is in the best position to take into account inconsistencies, along with the witnesses' manner and demeanor, and determine whether the witnesses' testimony is credible. As such, the trier of fact is free to believe or disbelieve all or any of the testimony. Consequently, although an appellate court must act as a "thirteenth juror" when considering whether the manifest weight of the evidence requires reversal, it must give great deference to the fact finder's determination of the witnesses' credibility.' (Citations omitted.) *State v. Montgomery*, 8th Dist. No. 95700, 2011-Ohio-3259, ¶ 10, quoting *State v. Blackman*, 8th Dist. No. 95168, 2011-Ohio-2262, ¶ 21.

{¶35} Upon review, we do not find that the jury clearly lost its way in assessing the testimony of Brown and Weems. Both of them testified that initially they were hesitant to speak with the police. Brown did not want to be labeled a snitch and Weems indicated that he wanted to avenge the crime himself. While they both have prior

convictions, they testified that they did not receive any benefit for testifying. Moreover, their testimony was consistent in that Slaughter, Green, Sisson, Weems, and Tyson were socializing outside of Brown's house when they were ambushed by Logan and Allen.

{¶36} Thus, based on the foregoing, we cannot say the jury clearly lost its way and created such a manifest miscarriage of justice that Logan's convictions must be reversed and a new trial ordered. *Martin*, 20 Ohio App.3d at 175, 485 N.E.2d 717.

{¶37} Accordingly, the first and second assignments of error are overruled.

Sleeping Juror

{¶38} In the third assignment of error, Logan argues the trial court deprived him of a fair trial when it conducted a voir dire examination of a sleeping juror at the end of trial, instead of when the issue was initially brought to the court's attention.

{¶39} The Ohio Supreme Court has found that the trial court has broad discretion in handling a situation in which a juror has fallen asleep during testimony. *State v. Sanders*, 92 Ohio St.3d 245, 253, 750 N.E.2d 90 (2001). *See also State v. Majid*, 182 Ohio App.3d 730, 2009-Ohio-3075, 914 N.E.2d 1113, ¶ 11 (8th Dist.). "'The trial judge is in the best position to determine the nature of the alleged jury misconduct' and 'the appropriate remedies for any demonstrated misconduct.'" *United States v. Sherrill*, 388 F.3d 535, 537 (6th Cir.2004), quoting *United States v. Copeland*, 51 F.3d 611, 613 (6th Cir.1995). Absent a showing that the trial court abused its discretion, the reviewing court must presume regularity. *State v. Madden*, 105 Ohio App.3d 116, 118, 663 N.E.2d

725 (6th Dist.1995), citing *State v. Robles*, 65 Ohio App.3d 104, 583 N.E.2d 318 (6th Dist.1989).

{¶40} In the instant case, Logan and codefendant Allen asked for an examination of Juror No. 1 and Juror No. 3. Prior to jury deliberation, the trial court conducted a separate examination of each juror in its chambers. With respect to Juror No. 1, the trial court inquired if he had been sleeping during trial. Juror No. 1 responded that he has been paying attention and that he "wasn't nodding off." The trial court and defense counsel were satisfied with the inquiry and Juror No. 1 remained on the panel. The trial court, however, removed Juror No. 3, who stated that there may have been a couple times where he drifted off, but did not know if it "was just for a second or if that was five minutes." The trial court replaced Juror No. 3 with an alternate juror. Neither defense counsel raised an objection to any other juror.

{¶41} Based on the foregoing, we find that the trial court properly remedied the juror concerns brought to its attention by defense counsel.

{¶42} Therefore, the third assignment of error is overruled.

## Closing Argument

{¶43} In the fourth assignment of error, Logan argues that the State deprived him of a fair trial by making improper statements during closing argument.

{¶44} We note that the trial court affords prosecutors wide latitude in making closing arguments. *State v. Benge*, 75 Ohio St.3d 136, 141, 661 N.E.2d 1019 (1996). "The touchstone of this analysis 'is the fairness of the trial, not the culpability of the

prosecutor.'" *State v. Noling*, 98 Ohio St.3d 44, 2002-Ohio-7044, 781 N.E.2d 88, ¶ 91, quoting *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). The test is whether the remarks were improper, and if so, whether they prejudicially affected substantial rights of the defendant. *State v. Smith*, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984), citing *United States v. Dorr*, 636 F.2d 117 (5th Cir.1981). Furthermore, "it is well settled that a party cannot complain of [an] opponent's argument to the jury, where it amounts only to a reply in kind to matters argued originally by him." *State v. Roland*, 8th Dist. No. 38393, 1979 WL 209968 (Mar. 15, 1979), citing *State v. Swanson*, 9 Ohio App.2d 60, 222 N.E.2d 844 (8th Dist.1967); *see also State v. Essa*, 194 Ohio App.3d 208, 2011-Ohio-2513, 955 N.E.2d 429 (8th Dist.).

{¶45} In the instant case, the prosecutor's statements that Logan complains of were in direct response to statements made by Allen's defense counsel. During closing argument, Allen's defense counsel stated:

> [T]rust me if you're going to describe the person of the face that you know you saw, you're going to use that kind of precise language. You don't suddenly come in and use that kind of language when you're testifying at trial.

> [T]rust me, trust those witnesses to know that if a person is standing over them close range, there is going to be that type of fouling and stippling.

The State responded by stating to the jury:

> Now [both defense counsel] come up here and they say don't listen to what the questions are, don't listen to me, don't listen to that but then she says trust me. You can't trust her. You can't. This isn't about trusting attorneys. You definitely can't trust defense counsel because their sole job is to acquit their defendants.

[Objection by both defense counsels, which is sustained by the trial court.]

She is up here saying trust me, and I'm telling you and the Court will tell you[,] you can't trust what attorneys tell you. You have to trust yourselves. You were here, you heard the evidence come in. I'm not going to get up here and tell you to trust me. I'm a prosecutor. I'm here to do a job. That is to present the evidence to you and then you guys make the decision.

**{¶46}** We find that the prosecutor made the above statements in response to defense counsel's closing argument on the credibility of the State's witnesses. These remarks did not amount to an expression of personal belief in Logan's guilt. *See Essa*, 194 Ohio App.3d 208, 2011-Ohio-2513, 955 N.E.2d 429, at ¶ 74.

**{¶47}** As such, the fourth assignment of error is overruled.

Merger

**{¶48}** In the fifth assignment of error, Logan argues the trial court erred by not merging the aggravated murder counts (Counts 1 and 2) with the attempted aggravated murder counts (Counts 3-5), claiming that the shooting was a single transaction.

**{¶49}** In *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061, the Ohio Supreme Court redefined the test for determining whether two offenses are allied offenses of similar import subject to merger under R.C. 2941.25.[1] The *Johnson*

---

[1]R.C. 2941.25 governs allied offenses and provides:

(A) Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B) Where the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses

court expressly overruled *State v. Rance*, 85 Ohio St.3d 632, 1999-Ohio-291, 710 N.E.2d 699, which required a "comparison of the statutory elements in the abstract" to determine whether the statutory elements of the crimes correspond to such a degree that the commission of one crime will result in the commission of the other.

{¶50} The *Johnson* court held that rather than compare the elements of the crimes in the abstract, courts must consider the defendant's conduct. *Id*. at syllabus. The *Johnson* court found:

> In determining whether offenses are allied offenses of similar import under R.C. 2941.25(A), the question is whether it is possible to commit one offense and commit the other with the same conduct, not whether it is possible to commit one without committing the other. * * *
>
> If multiple offenses can be committed by the same conduct, then the court must determine whether the offenses were committed by the same conduct, i.e., "a single act, committed with a single state of mind." [*State*] *v. Brown*, 119 Ohio St.3d 447, 2008-Ohio-4569, 895 N.E.2d 149, at ¶ 50, (Lanzinger, J., dissenting).
>
> If the answer to both questions is yes, then the offenses are allied offenses of similar import and will be merged.
>
> Conversely, if the court determines that the commission of one offense will never result in the commission of the other, or if the offenses are committed separately, or if the defendant has separate animus for each offense, then, according to R.C. 2941.25(B), the offenses will not merge. *Id*. at ¶ 48-50.

{¶51} A review of the record reveals that there was no discussion of the merger of the aggravated murder counts with the attempted aggravated murder counts at the

---

of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

sentencing hearing. The Ohio Supreme Court has found that the failure to merge allied offenses of similar import constitutes plain error. *State v. Underwood*, 124 Ohio St.3d 365, 2010-Ohio-1, 922 N.E.2d 923, ¶ 31, citing *State v. Yarbrough*, 104 Ohio St.3d 1, 2004-Ohio-6087, 817 N.E.2d 845. Under Crim.R. 52(B), "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."

{¶52} In the instant case, the trial court merged the one- and three-year firearm specifications and sentenced Logan to three years in prison on the firearm specification in Count 1, to be served prior and consecutive to 20 years to life in prison on the base charge of aggravated murder, and three years on the firearm specification in Count 2, to be served prior and consecutive to 20 years to life on the base charge of aggravated murder. The trial court also sentenced Logan to three years on the firearm specification in each of Counts 3, 4, and 5, to be served prior and consecutive to three years on the base charge of attempted aggravated murder. The trial court further sentenced Logan to one year in prison on Count 6 (having a weapon while under disability). The court ordered that Counts 1 and 2 run consecutively to each other and that Counts 3, 4, 5, and 6 run concurrently, for a total of 46 years to life in prison.

{¶53} Logan argues that trial court should have merged these counts because "[t]his was all one incident." In *State v. Snuffer*, 8th Dist. Nos. 96480-96483, 2011-Ohio-6430, ¶ 4, this court stated, "'[w]hen an offense is defined in terms of conduct towards another, then there is a dissimilar import for each person affected by the

conduct.' *State v. Phillips* (1991), 75 Ohio App.3d 785, 790, 600 N.E.2d 825, citing *State v. Jones* (1985), 18 Ohio St.3d 116, 118, 480 N.E.2d 408."

**{¶54}** Although this may have been "one shooting incident," it resulted in multiple victims. Logan committed two different acts of aggravated murder — one against Slaughter and the other against Green, and three different acts of attempted aggravated murder — the first against Sisson, the second against Weems, and the third against Tyson. The evidence at trial revealed that Logan and Allen chased after the victims, shooting at each of them. Based on the foregoing, we find these offenses were committed with a separate animus and are not allied offenses of similar import. As a result, the trial court's imposition of a separate sentence for each offense did not amount to plain error.

**{¶55}** Accordingly, the fifth assignment of error is overruled.

**{¶56}** Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

MARY EILEEN KILBANE, JUDGE

PATRICIA A. BLACKMON, A.J., and
SEAN C. GALLAGHER, J., CONCUR