[Cite as *State v. Shepard*, 2024-Ohio-1408.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
HIGHLAND COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | Case No. 23CA10 |
| Plaintiff-Appellee, | : | |
| v. | : | <u>DECISION AND</u> <u>JUDGMENT ENTRY</u> |
| RONALD W. SHEPARD, | : | |
| Defendant-Appellant. | : | **RELEASED 4/12/2024** |

_____
<u>APPEARANCES</u>:

Megan M. Patituce, Joseph C. Patituce, Patituce & Associates, LLC, Strongsville, Ohio, for appellant.

Anneka P. Collins, Highland County Prosecutor, Adam J. King, Highland County Assistant Prosecutor, Hillsboro, Ohio, for appellee.
_____
Hess, J.

{¶1} Ronald W. Shepard appeals his conviction following a jury trial on one count of gross sexual imposition involving his 11-year-old grandchild. Shepard contends that the trial court violated his Sixth Amendment right to confront the witnesses against him and present a meaningful defense when it did not allow him to question the victim and other family members about the victim's reputation for untruthfulness. However, we find the trial court did not abuse its discretion regarding the allowable scope of questioning of the victim, her mother, and her grandmother. Though the trial court erred in excluding the one permissible question about the victim's reputation for untruthfulness Shepard asked of the victim's sister, we find the error harmless.

{¶2}    Shepard also contends that his conviction was against the manifest weight of the evidence. He argues that his conviction came down to the credibility of the witnesses. Shepard's wife testified that their home did not have working internet access. Therefore, he argues that the victim's testimony about playing games and watching pornography with him was not credible. Additionally, Shepard argues that the victim's reputation for untruthfulness was developed sufficiently enough at trial that the jury should have questioned her credibility. However, after a review of the record, and after we consider the evidence and testimony adduced at trial and all reasonable inferences therefrom, witness credibility, and the conflicts in the evidence or lack thereof, we do not believe that the jury clearly lost its way so as to create a manifest miscarriage of justice such that Shepard's conviction must be reversed and a new trial ordered.

{¶3}    We overrule Shepard's assignments of error and affirm the trial court's judgment.

I. FACTS AND PROCEDURAL HISTORY

{¶4}    The Highland County grand jury indicted Shepard on one count of gross sexual imposition in violation of R.C. 2907.05(A)(4), a third-degree felony. Shepard entered a not guilty plea and the matter proceeded to trial.

{¶5}    Shepard is the victim's grandfather. The victim, A.S., testified that during the summer of 2021, between June 1, 2021 and November, 2021, she spent the night at her grandmother and grandfather's house almost every weekend. She would sleep in the guest bedroom. A.S. testified that she was over there a lot because she was helping them serve food at auctions. One evening when she and her grandfather, Shepard, were in the guest bedroom watching a movie, Shepard began touching her buttocks. He got up to

check that her grandmother was not paying attention and then he began touching A.S.'s vagina. A.S. testified that she was wearing shorts and a t-shirt and Shepard had his hand under her shorts. This made her feel uncomfortable and she told Shepard, but he told her that "it was fine." The touching lasted about 30 to 45 minutes and ended when the movie ended.

{¶6}   After that first incident, things progressed. A.S. testified that Shepard would ask her to come to his bedroom while her grandmother was sleeping and Shepard would touch her vagina and make her touch his penis. A.S. testified that white stuff would come out of Shepard's penis while she was touching it. If white stuff did not come out, then Shepard would be mad at her the rest of the time she was there. A.S. did not know what was happening when the white stuff came out, but Shepard told her "it was come." A.S. testified that her grandmother worked second shift during the months that A.S. frequently stayed with them and did not get home until 11:30 p.m.

{¶7}   A.S. testified that Shepard would try to force her to watch videos of "people having sex," which made her feel "really uncomfortable." A.S. testified that if she did as she was instructed by Shepard, he would let her play on his phone or tablet until "like three in the morning or whatever." But if she refused, he would be angry, take the phone or tablet away, and punish her the next day by not letting her go places. After Shepard started sexually abusing A.S., she eventually stopped going over to her grandparents' house. After she stopped visiting, Shepard told A.S. he had to take blood pressure medication to prevent a heart attack because she was no longer coming over to see him. A.S. did not tell anyone about the sexual abuse because she thought it was her fault, and Shepard had told her that she would be in trouble if she told anyone.

{¶8}   A.S. testified that even though she had stopped going over to Shepard's house in November 2021, he still came over to her house to visit. On March 10, 2022, she came home from school and Shepard was there, as was A.S.'s younger brother and her older sister.  Shepard was babysitting the younger brother. Right before Shepard left, he told A.S. he wanted her to start coming back over and A.S. told him, "no, I don't like what you do to me." At that point, A.S.'s older sister, K.S. came out of her room and, after Shepard left, asked about A.S.'s comment about not liking what Shepard did to her. At first A.S. denied anything was happening, but K.S. was insistent so A.S. told K.S. about Shepard touching her. K.S. told A.S. that she was going to tell their dad. Their dad told A.S.'s mom. A.S. also spoke with her mother and they went to the Mayerson Clinic at Cincinnati Children's Hospital.

{¶9}   On cross examination, Shepard's counsel asked, "You have a history of lying though, don't you.?" A.S. responded, "Yes, I do have a history of lying but it's not about big things." Shepard's attorney also asked, "Okay. You have a history of stealing things don't you?" and A.S. responded, "From my own house, yes."  Shepard's attorney and A.S. then had the following exchange:

Q:   Well, let me back up. Right before you disclosed your grandpa caught you stealing money from him, didn't he?
A:   No, he didn't.
Q:   He didn't?
A:   No, I never stole money from him.
Q:   Okay, you have no, how about money between the mattress, do you have any idea what I'm talking about?
A:   No, I don't.
Q:   Okay, where did the money between the mattress come from?
A:   He put it there.
Q:   How did you know it was there?
A:   Because he showed me.
Q:   Tell me about it, how did he show you…

A:      He went and got money from under the mattress one time and I was in there when he did.

Q:      Okay, so, when is it okay, you said you stole from your own family, so when is it okay to steal and when it is not?

A:      It's not.

Q:      I think you just said it's okay to steal from your own family.

A:      I said I did, I didn't say it was okay. (crying)

Q:      Okay, you've been in trouble before for lying, haven't you?

A:      Yeah.

On redirect, the prosecutor asked the following:

Q:      Now, [defense counsel] made a big deal about some lies that you've told?

A:      Yes.

Q:      What have you lied about?

A:      I have lied about taking things from my sister. About not cleaning my room, not doing my homework, hanging out with one of my friends that my mom didn't like.

Q:      Okay, so are you lying about what your grandfather did to you?

A:      No.

Q:      Now, you testified that you took something from your own house?

A:      Yes

Q:      What are you talking about?

A:      I used to go in my sister's room and I would wear her clothes or I would take one of her things that I thought was cool that I would like and I wasn't allowed to have, so I would take it out of her room. Or I would just go look around in my parent's [sic] room and see what they had and be a snoop.

Q:      So, when you say that you've stolen stuff from your own home, is that what you're talking about?

A:      Yes.

Q:      Have you heard, do you understand how serious it would be for you to tell a lie here today?

A:      Yes.

{¶10} A.S.'s older sister, K.S., testified that on March 10, 2022, she came home from school and her mother, Shepard, and her younger brother were home. A.S. was not home from school yet. Shepard was there to help K.S. babysit her younger brother. At some point K.S. noticed that Shepard and A.S. were having a conversation at the level of a whisper at the front door and K.S. overheard the last few moments of it. K.S. heard A.S.

tell Shepard that she did not like what Shepard did to her. This caused K.S. concern and when Shepard left shortly thereafter, K.S. asked A.S. if there was anything A.S. wanted to tell K.S. or anything that K.S. should know. A.S. initially denied anything had happened, but then K.S. told A.S. she had overheard the comment, and A.S. finally told K.S. about the sexual abuse. A.S. began crying and was a little shaky and asked K.S. not to tell anyone because she was afraid she would get in trouble. K.S. explained that she had to let someone know and later that evening K.S. told their father about it.

{¶11} Shepard's defense counsel asked K.S., " * * * you know your sister has a history of lying doesn't she?" The trial court sustained the state's objection. No further questions about A.S.'s alleged reputation for lying and no questions about whether K.S. knew of any specific instances of A.S. stealing were permitted.

{¶12} A.S.'s mother, T.B., testified that she had three children and had been in a relationship with her children's father, J.S., for 19 years though they had never married. T.B. is not employed outside the home because her son is a special needs child. Shepard is T.B.'s stepfather and started dating T.B.'s mother when T.B. was 13 years old. On March 10, 2022, T.B. had a doctor's appointment in the afternoon and then planned to meet a friend for dinner so she contacted Shepard to come to her house to help watch her son. After K.S. came home from school, T.B. left for the doctor's appointment. During her dinner with her friend, J.S. called her and told her what he had learned from K.S. about Shepard's sexual abuse of A.S. She left immediately and went home. She and J.S. talked about the abuse and decided to call the sheriff's office and file a report the next morning.  T.B. also contacted her mother, V.S. – Shepard's wife, and V.S. came over right away.

**{¶13}** T.B. testified that she, V.S., and A.S. discussed the sexual abuse and V.S. reacted very emotionally, sobbing and apologizing. Afterwards, V.S. removed her clothing and belongings from her home, went to the bank and withdrew cash, closed her accounts, and packed up her stuff to stay at T.B.'s older sister's home. After T.B. contacted the sheriff's office, she took A.S. to Cincinnati Children's Hospital.

**{¶14}** T.B. testified that prior to learning of the sexual abuse, she had noticed several things that caused concern. Shepard constantly asked for A.S. to come to his house and when T.B. would say no, Shepard would try to get T.B. to change her mind. Shepard would also ask to have A.S. put on the phone so that he could try to change her mind. T.B. was also concerned that she had caught A.S. viewing pornography in September or October of 2021, and that "raised a lot of concern of where she would even have that idea at that age." T.B. asked A.S. about whether something was going on with her and Shepard at the grandparents' house but A.S. denied anything was going on. T.B. also noticed that A.S.'s behavior had changed and that she was "very agitated all the time, seemed on the edge at home. Very unhappy, depressed, she was isolating herself in her room." T.B. testified that her mother, V.S. (A.S.'s grandmother and Shepard's wife), worked the second shift during the June 2021 to November 2021 time frame, which was 3 p.m. to 11 p.m. T.B. testified that her mother was taking Ambien, a sedative to help her sleep.

**{¶15}** On cross examination, Shepard's attorney asked T.B. when A.S. began acting out and T.B. said the summer of 2020. Shepard's attorney asked, "Okay and that's

when she got caught stealing Grandpa's money, right?" The state objected and the trial court sustained it.[1]

**{¶16}** Ashley Cremeans, a social worker and forensic interviewer at Cincinnati Children's Hospital, testified about the forensic interview process and her interview of A.S., which was conducted on March 15, 2022. Cremeans prepared a report which was introduced as an exhibit and indicated A.S.'s date of birth of July 1, 2010, thus A.S. would have been 10 years old on June 1, 2021 and then turned 11 years old that summer. Cremeans also identified her recorded interview of A.S., which was played for the jury. During the recorded interview A.S. told Cremeans about how Shepard touched her butt and rubbed her vagina, forced her to touch his penis, and tried to force his penis into her vagina but was not able to because it was too painful. A.S. stated that Shepard would watch pornography and masturbate while Shepard's wife was at work. A.S. told Cremeans about how Shepard would make A.S. get into bed with him after her grandmother was asleep and how eventually she stopped going over to her grandparents' house because she was so uncomfortable with what Shepard was doing. Cremeans testified that she performed a TSSC on A.S., which is a pediatric trauma screening tool. A.S. indicated signs of trauma based on her answers. Based on the trauma screening tool, Cremeans recommended that A.S. receive mental health treatment. Cremeans also testified that delayed disclosure of abuse is very common in children.

**{¶17}** Detective Sergeant Vincent Antinore of the Highland County Sheriff's Office testified that he is the supervisor of the detective's division and approximately 90% of the cases he investigates are juvenile sex crimes or sexual assaults on juveniles. Detective

---

[1] The transcript indicates that at this point there was a bench conference, but the discussion was not transcribed and is not part of the record.

Antinore testified that on March 10, 2022, A.S. and her mother came into the sheriff's office and reported that A.S. had been sexually assaulted by her grandfather. He referred them to the Cincinnati Children's Hospital Mayerson Center for a forensic interview and medical attention. On March 15, 2022, Detective Antinore travelled to the home of Ronald Shepard and spoke with Shepard. During his interview of Shepard, Shepard did not give any reason why A.S. would make up the story. Shepard agreed with Detective Antinore that "something took place between he and [A.S.]." Detective Antinore testified that Shepard "blamed it on somebody at her house, the second time he blamed it on a birthday party…."

**{¶18}** V.S., Shepard's wife and A.S.'s grandmother, testified in her husband's defense and stated that she had been married to Shepard for 22 years. V.S. testified that she does not take Ambien. V.S. testified that from January 2021 to January 2022 no one could use the internet at her house because it wasn't working. V.S. said there was no way to watch pornography at her house because when they tried to have internet "it would just circle." V.S. testified that Shepard does not have a computer and she has seen him try to use the internet, "but he can't get on it." V.S. testified that she is a light sleeper and is "usually up three of four times." She also has congestive heart failure and, as a result, "I can't sleep well."

**{¶19}** On cross examination, V.S. denied that she had packed up her things and moved out. Instead, she testified that she stayed at her daughter's house for one night. She admitted that she apologized to A.S. the day she first learned of the allegations "because I didn't know what was going on." V.S. denied that she had ever joked around with family members at Christmas time about sleep shopping because of her Ambien.

She testified, "I didn't take Ambien. I prescribed [sic] Ambien but I never took it." V.S. stated that she was "probably just joking around" with family members about taking Ambien, "I never took Ambien. * * * I was prescribed it but I didn't take it." V.S. testified that although Shepard does not have a computer, he has a cell phone.

**{¶20}** The jury found Shepard guilty of gross sexual imposition. The trial court sentenced Shepard to a prison term of 60 months, and he was classified as a Tier II registered sex offender.

## II. ASSIGNMENTS OF ERROR

**{¶21}** Shepard presents the following assignments of error:

I.      The trial court abused its discretion in denying the defense the opportunity to ask questions related to A.S.'s untruthfulness which resulted in a violation of Mr. Shepard's Sixth Amendment rights.

II.     Mr. Shepard's conviction was against the manifest weight of the evidence.

## III. LAW AND ANALYSIS

### A. Limitations on Cross Examination

**{¶22}** Shepard contends that the trial court abused its discretion when it denied him the opportunity to cross-examine witnesses about A.S.'s lying and a specific allegation that she had stolen from Shepard. Shepard was permitted to ask A.S. whether she had a history of lying and stealing. A.S. admitted that she had a history of lying, but not about big things. She also admitted she had stolen things from her own house. However, she denied ever stealing money from Shepard. Shepard attempted to ask A.S.'s sister, mother, and grandmother about A.S.'s lying and/or stealing but was not permitted because the trial court sustained the state's objections to the questioning.

Shepard argues that Evid.R. 608 permits him to ask questions of the other witnesses about A.S.'s character or reputation for untruthfulness.

**{¶23}** Shepard argued that his defense theory "hinged on A.S.'s decision to lie after she was caught stealing from her grandfather."

1.  Standard of Review

**{¶24}** The Sixth Amendment to the United States Constitution guarantees defendants the right to confront the witnesses against them and includes the right to cross-examination. *Davis v. Alaska*, 415 U.S. 308, 315, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974); *Delaware v. Van Arsdall*, 475 U.S. 673, 678, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); *State v. Brunson*, 171 Ohio St.3d 384, 2022-Ohio-4299, 218 N.E.3d 765, ¶ 52. "However, the right to confrontation is not limitless. The right does not prevent a trial court from imposing limits on defense counsel's inquiry into the potential biases of a prosecution witness." *Brunson* at ¶ 53. The "Confrontation Clause guarantees only 'an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.' " (Emphasis sic.) *State v. Lang*, 129 Ohio St.3d 512, 2011-Ohio-4215, 954 N.E.2d 596, ¶ 83, quoting *Delaware v. Fensterer,* 474 U.S. 15, 20, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985). The extent to which cross-examination is permitted with respect to a particular subject of inquiry lies within a trial court's sound discretion. *State v. Green*, 66 Ohio St.3d 141, 147, 609 N.E.2d 1253 (1993). A trial court's decision regarding allowable scope of cross-examination will not be reversed absent an abuse of discretion. *State v. Hunt*, 4th Dist. Scioto No. 17CA3811, 2018-Ohio-4183, ¶ 53.

2.  Evid.R. 608

{¶25} "Evidence of the character of a witness on the issue of credibility is admissible as provided in Rules 607, 608, and 609." Evid.R. 404(A)(3). Character evidence is governed by Evid.R. 608:

> **(A) Opinion and Reputation Evidence of Character.** The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations: (1) the evidence may refer only to character for truthfulness or untruthfulness, and (2) evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise.
>
> **(B) Specific Instances of Conduct.** Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness's character for truthfulness, other than conviction of crime as provided in Evid.R. 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if clearly probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness's character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.
>
> The giving of testimony by any witness, including an accused, does not operate as a waiver of the witness's privilege against self-incrimination when examined with respect to matters that relate only to the witness's character for truthfulness.

{¶26} First, the trial court permitted Shepard to cross-examine A.S. on her reputation for untruthfulness in accordance with Evid.R. 608(A).  Shepard was permitted to ask A.S. about her "history of lying" and "history of stealing things."  Shepard was also permitted to ask A.S. about specific instances of conduct under Evid.R. 608(B), which was the alleged theft of money from Shepard's mattress. Under Evid. R. 608(B)(1), this alleged theft of money from Shepard "may not be proved by extrinsic evidence" but, if clearly probative of untruthfulness, the trial court in its discretion can allow Shepard to

cross-exam A.S. about the alleged theft of money from the mattress. Shepard asked A.S. about this alleged theft and she denied it. Later in the cross-examination of A.S., Shepard asked again about the alleged theft from Shepard, even though he had previously asked A.S. about it and she had denied it. The state objected on the ground it had been asked and answered, "I'm going to object. This has been asked." The trial court sustained the objection. Requiring A.S. to answer again would result in harassment of the victim and repetitive testimony. Thus, we find no error – and certainly no abuse of discretion – in the trial court's rulings as it relates to the cross-examination of A.S.

**{¶27}** A.S. testified about the types of lies she has told: "I lied about taking things from my sister. About not cleaning my room, not doing my homework, hanging out with one of my friends." A.S. also testified about the things she has stolen: "I would wear her [A.S.'s sister] clothes or I would take one of her things that I thought was cool that I would like and I wasn't allowed to have." Because A.S. denied stealing money from Shepard's mattress, Shepard had to take her answer as given and could not contradict her denial by confronting her with extrinsic evidence or attempting to prove the matter through testimony of other witnesses. Evid.R. 608(B) explicitly prohibited the admission of the extrinsic evidence. *State v. Ruble,* 2017-Ohio-7259, 96 N.E.3d 792, ¶ 37 (4th Dist.), citing *State v. Widmer*, 12th Dist. Warren No. CA2012-02-008, 2013-Ohio-62, ¶ 81 ("Evid.R. 608(B) permits cross-examination of a witness's character for truthfulness or untruthfulness[, but] [t]he cross-examiner must take the witness's answers as given and cannot contradict a denial either by confronting the witness with extrinsic evidence or proving the matter with such evidence"). Therefore, Shepard could not ask any of the other witnesses about A.S.'s alleged stealing from Shepard because this would be an

attempt to prove the specific instance of the alleged theft. In accordance with Evid.R. 608(B), the trial court properly sustained the state's objection to questions of the other witnesses (sister K.S., mother T.B., and grandmother V.S.) concerning the alleged stealing.

{¶28} Finally, Shepard contends that he was denied the opportunity to ask K.S., T.B., and V.S. about A.S.'s reputation for untruthfulness in violation of Evid.R. 608(A). Shepard asked K.S., "you know your sister has a history of lying doesn't she?" and "Can you give me specific instances of when your sister has been caught lying?" but objections to these questions were sustained.

{¶29} Although Shepard contends he was prevented from asking T.B. about A.S.'s reputation for untruthfulness, he does not cite any place in the record and we cannot find any place where he asks T.B. about A.S.'s reputation for untruthfulness. However, on direct examination, T.B. was asked about whether A.S. has lied about things and T.B. responded, "Of course, she's a child * * * maybe doing her homework and it not being complete or saying she completed her laundry and put it away but maybe hid it in her closet until the next day. Following through on her chores and they not being completed. Just simple things that kids tend to tell a fib about."

{¶30} Shepard asked V.S. about "a conversation" she may have had with A.S. about telling the truth. The state objected and the trial court sustained. The basis for the objection was not stated but it would have been proper to exclude testimony of this conversation as hearsay. Shepard also asked V.S., "did you run into problems with [A.S.] lying?" The state objected and the trial court sustained it because, "it's not proper under the rule. * * * You've got to bide, obey the rules of evidence." Last, Shepard asked V.S.,

"have you ever heard [T.B] use a derogatory term towards her daughter as it relates to truthfulness?" and "Have you ever had a conversation with [T.B.] about [A.S's] truthfulness?" Again, these last questions asked about out of court statements that may have occurred, which would have been properly excluded as hearsay.

{¶31} Under Evid.R. 608(A), Shepard could ask other witnesses about A.S.'s reputation for untruthfulness, but it is subject to the limitation under Evid.R. 608(A)(1). Under Evid.R. 608(A)(1), the evidence of A.S.'s reputation may only refer to A.S.'s character for truthfulness or untruthfulness. A witness cannot testify about whether another witness is being truthful in a particular instance because that infringes upon the role of the jury. The Third District Court of Appeals recently explained:

> "In our system of justice it is the fact finder, not the so-called expert or lay witnesses, who bears the burden of assessing the credibility and veracity of witnesses." *State v. Eastham*, 39 Ohio St.3d 307, 312, 530 N.E.2d 409 (1988). For this reason, "[o]pinion testimony regarding another witness's credibility 'infringe[s] upon the role of the fact finder, who is charged with making determinations of veracity and credibility.' " *State v. Smith*, 2017-Ohio-9283, 102 N.E.3d 1111, ¶ 46 (10th Dist.), quoting *Eastham* at 312, 530 N.E.2d 409. "Generally, the opinion of a witness as to whether another witness is being truthful is inadmissible." *State v. Essa*, 194 Ohio App.3d 208, 2011-Ohio-2513, 955 N.E.2d 429, ¶ 90 (8th Dist.).

> However, Evid.R. 608(A) does permit some opinion evidence regarding the credibility of a witness under specified circumstances and reads as follows:

>> The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations: (1) the evidence may refer only to character for truthfulness or untruthfulness, and (2) evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise.

> Evid.R. 608(A). "While Evid.R. 608(A) permits testimony regarding a witness's general character or reputation for truthfulness, the rule prohibits testimony regarding a witness's truthfulness on a particular

occasion." *State v. Pawlak*, 8th Dist. Cuyahoga No. 99555, 2014-Ohio-2175, 2014 WL 2167887, ¶ 41.

*State v. Bruce*, 2023-Ohio-3298, 224 N.E.3d 715, ¶ 60-61 (3d Dist.); *State v. Denson*, 1st Dist. Hamilton No. C-220208, 2023-Ohio-847, ¶ 26 (great-aunt and mother were properly asked questions about child victim's character for truthfulness with questions like "have you ever known her to lie?" and "in terms of telling lies, what can you tell us?" They were not asked whether they believed the allegations or whether the allegations were truthful.).

{¶32} Under Evid.R. 608(A)(1), it would have been permissible for Shepard to have asked K.S., T.B., or V.S. whether A.S. had a reputation for lying. Thus, Shepard's question of K.S., "you know your sister has a history of lying doesn't she?" was permissible under Evid.R. 608(A)(1). However, the question of V.S. which asked, "did you run into problems with [A.S.] lying?" is poorly worded and does not clearly ask V.S. if A.S. has a reputation for lying. *See State v. Tutolo*, 8th Dist. Cuyahoga No. 60071, 1992 WL 47234, *3 (Mar. 12, 1992) (defendant had a right under Evid.R. 608(A)(1) to attack the declarant's credibility by evidence in the form of opinion so long as it referred to the declarant's character for truthfulness or untruthfulness. However, the question to which the state objected asked whether the witness "believed them to be 'believable and reliable.' 'Reliable' could mean something other than 'truthful' but 'believable' was the equivalent of 'truthful.' The objection should have been overruled as to 'believable.' "); *See State v. Cook*, 3rd Dist. Union No. 14-19-26, 2020-Ohio-3411, ¶ 41 (a witness can be asked about a child victim's general character for truthfulness or untruthfulness to undermine the child's credibility. However, a defense counsel's questions concerning the child's credibility with respect to the child's particular allegations against defendant are improper.); *State v. Thompson*, 6th Dist. Lucas No. L-21-1015, 2022-Ohio-2438, ¶ 193

(assuming that the defense laid a proper foundation, which appellate court assumed could be done given the close relationship between aunt and niece, aunt could have testified to her niece's character for untruthfulness); *State v. Pawlak*, 8th Dist. Cuyahoga No. 99555, 2014-Ohio-2175, ¶ 115 ("While Evid.R. 608(A) permits testimony regarding a witness's general character or reputation for truthfulness, the rule prohibits testimony regarding a witness's truthfulness on a particular occasion.").

**{¶33}** We find that the question of V.S. ("did you run into problems with [A.S.] lying?"), is problematic in its wording, vague, and does not specifically ask about A.S.'s character or reputation for untruthfulness. We find that the question fell outside the scope of Evid.R. 608(A). However, even if the question arguably fell within Evid.R. 608(A), we find no error in the trial court's decision to sustain the objection on the ground that it was repetitive. A trial judge has broad discretion to place reasonable limits based on concerns about an interrogation that is repetitive or only marginally relevant. *State v. Green*, 66 Ohio St.3d 141, 147, 609 N.E.2d 1253 (1993). By the time Shepard had questioned V.S. about A.S.'s lying, two previous witnesses (A.S. and T.B.) had already testified at some length about A.S.'s history of lying and the nature of the lies the child told. The trial court here had broad discretion to limit additional questions as repetitive. Moreover, any attempt to get V.S. to testify that A.S.'s allegations against Shepard were lies – which was the defense's theory of the case – would have been improper.

**{¶34}** We find that the question of K.S. soliciting specific instances of lying fell outside the scope of Evid.R. 608(A)(1), which only permits questions about character or reputation for untruthfulness. Specific instances of conduct (i.e., lies) cannot be inquired into if the trial court does not allow it. And here, specific instances of A.S.'s lies could not

be inquired of K.S. because under Evid.R. 608(B)(2), K.S. had not testified previously about A.S.'s character for untruthfulness. Additionally, while we find that the question of K.S. ("you know your sister has a history of lying doesn't she?") was permissible under Evid.R. 608(A)(1), we find the trial court's error in excluding it did not affect the outcome of Shepard's trial and is therefore harmless. *State v. Jones,* 160 Ohio St.3d 314, 2020-Ohio-3051, 156 N.E.3d 872. The jury heard testimony from several witnesses about A.S.'s character or reputation for untruthfulness and could form a basis upon which to judge her credibility. Moreover, Shepard's defense theory is that A.S. is a liar who made up a story about sexual abuse in response to being accused of stealing money from Shepard. His defense theory cannot be reconciled with K.S.'s testimony. According to K.S., A.S. whispered, "I do not like what you do to me" to Shepard in response to him pressuring her to come to his house. Her sister overheard the whispered comment, asked her about it, and A.S. reluctantly and tearfully told her sister and asked that she not tell anyone. Additional repetitive testimony about A.S.'s reputation for untruthfulness would have no impact on, or relevance to, the jury's assessment of K.S.'s credibility.

**{¶35}** We overrule Shepard's first assignment of error.

### B. Manifest Weight of the Evidence

**{¶36}** Shepard contends that his conviction for gross sexual imposition was against the manifest weight of the evidence. Specifically, he argues that while A.S. "testified that Shepard used electronics and internet access to gain her compliance, [V.S.] testified that their home did not have working internet access." He argues that the "fact that it was not working during the summer A.S. spent with her grandparents calls into question her credibility regarding not only the internet-related allegations, but also the

allegations related to her grandfather's conduct." Shepard also argues that even though he was limited in building a record concerning A.S.'s reputation for untruthfulness, the jury was nevertheless aware that A.S. had a history of lying because she testified about it. Shepard concludes that in "consideration of the weight of the evidence offered at trial, the jury lost its way in convicting" him. In sum, Shepard argues that the jury should have believed his wife and not his granddaughter.

### 1. Standard of Review

**{¶37}** In determining whether a criminal conviction is against the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that reversal of the conviction is necessary. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997); *State v. Hunter*, 131 Ohio St.3d 67, 2011-Ohio-6524, 960 N.E.2d 955, ¶ 119. To satisfy this test, the state must introduce substantial evidence on all the elements of an offense, so that the jury can find guilt beyond a reasonable doubt. *See State v. Eskridge*, 38 Ohio St.3d 56, 526 N.E.2d 304 (1988), syllabus; *State v. Harvey*, 4th Dist. Washington No. 21CA3, 2022-Ohio-2319, ¶ 24. Because a trier of fact sees and hears the witnesses, appellate courts court will also afford substantial deference to a trier of fact's credibility determinations. *State v. Schroeder*, 2019-Ohio-4136, 147 N.E.3d 1, ¶ 61 (4th Dist.); *State v. Colonel*, 2023-Ohio-3945, 227 N.E.3d 336, ¶ 50-54 (4th Dist.).

### 2. Elements of Gross Sexual Imposition

{¶38} Shepard was convicted of gross sexual imposition in violation of R.C. 2907.05(A)(4), which provides: "(A) No person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender; or cause two or more other persons to have sexual contact when any of the following applies: * * * (4) The other person, or one of the other persons, is less than thirteen years of age, whether or not the offender knows the age of that person." Sexual contact is defined as "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person." R.C. 2907.01(B).

{¶39} A.S. testimony provided evidence on all elements of gross sexual imposition. Additionally, K.S. provided testimony that she overheard A.S. telling Shepard that she "did not like what you do to me" and became concerned and questioned her younger sister about it. Though initially very reluctant to discuss it, A.S. tearfully told her older sister about the abuse, who then informed their father. Cremeans also testified that she conducted a recorded interview of A.S. The interview was played for the jury and in it A.S. described all the elements of gross sexual imposition. Additionally, A.S.'s credibility was bolstered by the testimony of her mother, T.B., who testified that she was concerned with A.S.'s behavioral changes, depression, isolation, and the fact that she had accessed pornography at age 11. T.B. also testified that Shepard was noticeably persistent in insisting that A.S. come and spend the night. If T.B. disallowed it, Shepard would try to get her to change her mind. If A.S. refused, Shepard would ask T.B. to put A.S. on the phone so he could speak to her directly and try to change her mind.

**{¶40}** Finally, the jury had the ability to hear and evaluate the credibility of V.S., who despite having great difficulty sleeping, problems waking three or four times a night, and a prescription for Ambien, testified that she never took Ambien and, when questioned about a time she told family members she was taking it, testified that "we were probably just joking around, I never took Ambien." Additionally, contrary to Shepard's contentions, V.S.'s testimony about internet access did not conflict with A.S.'s testimony about playing games or watching pornography on it. V.S. testified that they did, in fact, have internet at their house, but they could not use it because it did not work, "it would just circle." Shepard does not deny that they had internet access, rather he characterized her testimony as meaning they did not have "working" internet access. However, an internet with lagging, buffering, or spinning circles is not the same as no internet at all. The jury was free to believe all, part, or none of V.S.'s testimony about her Ambien use and her husband's internet use. Her credibility as well as that of the other witnesses is an issue for the jury to resolve because they see and hear the witnesses. We afford substantial deference to the jury's determinations of credibility. Having reviewed the testimony and other evidence adduced at trial, we do not believe that the jury clearly lost its way in convicting Shepard of gross sexual imposition.

## V. CONCLUSION

**{¶41}** Having overruled the assignments of error, we affirm the trial court's judgment.

JUDGMENT AFFIRMED.

## JUDGMENT ENTRY

It is ordered that the JUDGMENT IS AFFIRMED and that appellant shall pay the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Highland County Court of Common Pleas to carry this judgment into execution.

IF A STAY OF EXECUTION OF SENTENCE AND RELEASE UPON BAIL HAS BEEN PREVIOUSLY GRANTED BY THE TRIAL COURT OR THIS COURT, it is temporarily continued for a period not to exceed 60 days upon the bail previously posted. The purpose of a continued stay is to allow appellant to file with the Supreme Court of Ohio an application for a stay during the pendency of proceedings in that court. If a stay is continued by this entry, it will terminate at the earlier of the expiration of the 60-day period, or the failure of the appellant to file a notice of appeal with the Supreme Court of Ohio in the 45-day appeal period pursuant to Rule II, Sec. 2 of the Rules of Practice of the Supreme Court of Ohio. Additionally, if the Supreme Court of Ohio dismisses the appeal prior to expiration of 60 days, the stay will terminate as of the date of such dismissal.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Smith, P.J. & Wilkin, J.: Concur in Judgment and Opinion.

For the Court

BY: _____
     Michael D. Hess, Judge

## NOTICE TO COUNSEL

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**